Edgar STEPHENS, Appellant,

v.

ITT/FELEC SERVICES and Cigna Cos., Appellees.

No. S–6642.

Supreme Court of Alaska.

May 3, 1996.

Chancy Croft, Chancy Croft Law Office, Anchorage, for Appellant.

Allan E. Tesche, Russell, Tesche & Wagg, Anchorage, for Appellees.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

We must decide whether Edgar Stephens's employer, ITT/Felec Services (ITT), overcame the statutory presumption of compensability by producing substantial evidence that a heart attack Stephens suffered while working was not work-related. The Alaska Workers' Compensation Board (Board) found that ITT overcame the presumption of compensability. The Board also found that Stephens was unable to prove his claim by a preponderance of the evidence. Stephens appeals. We affirm the Board's conclusion that ITT overcame the presumption of compensability. We remand for findings on the question of whether Stephens proved the elements of his claim by a preponderance of the evidence. We affirm the Board's decision not to order an independent medical examination.

### II. FACTS AND PROCEEDINGS

Stephens was employed by ITT as an electrical rigger. He worked for three years at remote Distant Early Warning (DEW) Line sites operated by ITT for the federal government. On May 1, 1990, he arrived for work at the Oliktock, POW–2, site. He worked at the radome, a metal structure containing radar apparatus, antennae, and control facili-

ties.[1] After arriving, he staged tools and materials necessary to install a warning light on top of the radome. Stephens worked until May 4 without incident.

On May 4 Stephens arose, ate breakfast, smoked a cigarette, watched the news, and reported to work at 8:00 a.m.[2] At approximately 9:00 a.m. he climbed into the interior of the radome, where he performed some sedentary work near a switch he and a co-worker had installed two days previously. After approximately fifteen minutes, Stephens determined that he needed additional parts from the ground floor radar room, so he descended approximately forty to fifty-three feet using the ladders and spiral staircase. He returned with the parts to the dome's interior, completing the roundtrip in approximately five minutes. He worked for another two to three minutes until he found that he needed different parts, which were also located below. He again made the descent to ground level.

At some point during or after this descent, Stephens "started breaking out in a sweat," started coughing, and began having difficulty breathing. Stephens was uncertain whether his symptoms began while he was descending the ladders or the staircase, or if they did not begin until after he had completed the descent. He testified that he felt that he was "strangling" from the mucous in his throat. Stephens unsuccessfully tried to clear his throat by performing a Heimlich maneuver on himself. He then regurgitated, clearing his air passage, allowing him to breathe again. He went to his room, where he lay down, elevated his feet, and calmed himself with deep breathing exercises. Although he started to feel a little better, he still felt shaky and weak. After getting up to talk with his supervisor, he returned to his room,

lay down, rested, and noticed some improvement.

That evening Stephens was driven to Kuparuk where a physician's assistant took his blood pressure, performed an EKG, and told him that he might have had a heart attack. Stephens flew to Fairbanks and saw a variety of physicians; they confirmed that he had suffered a heart attack.

Stephens underwent exercise stress tests in Fairbanks. In Anchorage, Dr. William Mayer, a cardiologist, gave him an angiogram and then performed a cardiac catheterization. The catheterization indicated blockage of at least two coronary arteries, "damage to the bottom portion of the heart consistent with a previous heart attack," and atherosclerosis.

Stephens recuperated for several months, and returned to work with ITT on August 28 or 29. His treating physician, Fairbanks family practitioner Dr. Donald Thieman, released Stephens to his previous employment without restriction. Stephens worked in this capacity with ITT until he was laid off on September 21.

Stephens subsequently filed a workers' compensation claim, which ITT and its insurer, CIGNA Companies, (collectively "ITT") controverted, pending medical documentation that his condition arose out of his employment. Stephens filed an Application for Adjustment of Claim, asking that his heart attack be accepted as a work-related injury, and requesting an award of benefits. The Board heard testimony and issued a Decision and Order on June 20, 1991, awarding Stephens compensation on the ground that ITT had not overcome the statutory presumption of compensability. ITT sought reconsideration, arguing that the Board had applied an

1. The dome itself is forty to fifty feet in diameter and rests on a rectangular structure, known as a "plenum," approximately eight feet high. The plenum, which resembles a large room, stands fifty feet above the ground. To reach a work site inside the radome, one climbs a nine- to ten-foot ladder within the ground floor radar room and ascends a spiral staircase twenty-five to thirty-five feet in height to the floor of the plenum. One then walks about twenty feet inside the plenum and then climbs another eight-foot ladder to reach the floor of the radome. According-

ly, going from the radome floor to ground level requires a descent of between forty-two and fifty-three feet.

2. Stephens is a smoker who, before his heart attack, smoked three-quarters of a pack to one pack of cigarettes a day. He had a history of high blood pressure for which he took at least two forms of medication before his heart attack, and for which he had been treated for at least six years.

incorrect standard of law in determining that ITT had not overcome the presumption. By decision of August 1991, the Board found that ITT had not overcome the presumption because it had not eliminated all reasonable possibilities that work-related conditions were a substantial factor in the development of his heart attack.

ITT appealed to the superior court. In October 1992 that court remanded the case to the Board with instructions to apply the legal standard articulated in *Big K Grocery v. Gibson,* 836 P.2d 941 (Alaska 1992).

In a two-to-one decision issued in March 1993, the Board concluded on remand that ITT had overcome the presumption of compensability and that Stephens was unable to prove his claim by a preponderance of the evidence.[3] Thus the Board denied Stephens's claim for benefits. Stephens appealed the Board's decision; the superior court affirmed. This appeal followed.

### III. *DISCUSSION*

Under the Alaska Workers' Compensation Act, an employee's claim is presumed to be compensable. AS 23.30.120(a)(1). Application of this statutory presumption involves a three-step analysis. *Gillispie v. B & B Foodland,* 881 P.2d 1106, 1109 (Alaska 1994). First, the employee must establish a "preliminary link" between his or her disability and the employment. *Id.* After this link is established, it is the employer's burden to overcome the presumption by coming forward with substantial evidence that the injury was not work-related. *Id.* (citing *Miller v. ITT Arctic Servs.,* 577 P.2d 1044, 1046 (Alaska 1978)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Grainger v. Alaska Workers' Compensation Bd.,* 805 P.2d 976, 977 n. 1 (Alaska 1991)). In determining whether the employer produced substantial evidence, "[i]t is not the function of this court to reweigh the evidence but only to determine whether such evidence exists."

*Kessick v. Alyeska Pipeline Serv. Co.,* 617 P.2d 755, 757 (Alaska 1980).

An employer has always been able to rebut the presumption of compensability by presenting expert opinion evidence that "the claimant's work was probably not a substantial cause of the disability." *Big K Grocery v. Gibson,* 836 P.2d 941, 942 (Alaska 1992). Since the presumption shifts only the burden of production to the employer and not the burden of proof, we examine the evidence tending to rebut the presumption by itself in determining whether substantial evidence has been presented. *Veco, Inc. v. Wolfer,* 693 P.2d 865, 869 (Alaska 1985). Medical testimony cannot constitute substantial evidence if it simply points to other possible causes of an employee's injury without ruling out work-related causes. *Childs v. Copper Valley Elec. Ass'n,* 860 P.2d 1184, 1189 (Alaska 1993).

Once the employer produces substantial evidence to rebut the presumption of compensability, the presumption vanishes and the employee must prove the elements of his or her claim by a preponderance of the evidence. *Wolfer,* 693 P.2d at 870. In reviewing the Board's decision as to whether a claimant has established his or her claim by a preponderance of the evidence, we determine whether the Board's findings are supported by substantial evidence. *Gillispie,* 881 P.2d at 1111.

### A. *Rebuttal of Presumption of Compensability*

Stephens argues that the Board erred in failing to make findings regarding his working conditions, the testimony of lay witnesses, and Dr. Thieman's opinion in its determination that ITT had overcome the presumption of compensability.

In reaching its decision, the Board relied on the testimony of three physicians: Stephens's treating otolaryngologist, Richard Raugust, M.D.,[4] Stephens's treating cardiolo-

---

**3.** The dissenting Board member stated that ITT had not presented the substantial evidence necessary to overcome the presumption of compensability.

**4.** Because of Stephens's chronic sinus problems, Dr. Raugust was asked to see Stephens in the hospital at the time he was admitted for his myocardial infarction. According to Dr. Rau-

gist, William Mayer, M.D., and ITT's cardiologist, Geoffrey Tofler, M.D. The Board also considered Stephens's testimony regarding his job and the conditions surrounding the job. The Board's decision did not mention the testimony of Stephens's co-workers about the working conditions. None of the physicians who evaluated Stephens directly heard the co-workers' comments.

 Stephens argues that the Board erred by declining to issue detailed findings of fact regarding the testimony of the lay witnesses. In determining whether ITT rebutted the presumption of compensability, however, the Board does not weigh evidence offered by the employer against that offered by the employee, but rather examines the evidence offered by the employer standing alone. *Wolfer*, 693 P.2d at 869. Although the Board need only look at evidence tending to rebut the presumption of compensability, that evidence must be comprehensive and reliable.

To be comprehensive and reliable, the physicians' testimony about whether Stephens's work was a substantial cause of his heart attack necessarily had to consider Stephens's work conditions on the day of his attack. These conditions included the temperature, the amount of dust in the atmosphere, the level of physical exertion required, the level of emotional stress, and Stephens's diet. Even though the physicians did not directly hear the lay witnesses' testimony, the attorneys asked the physicians about various hypothetical situations. Some of these hypotheticals incorporated the content of the lay witnesses' testimony. The doctors also interviewed Stephens to some extent, and at least one of them, Dr. Tofler, reviewed Stephens's deposition before formulating his opinion. The two cardiologists, Drs. Mayer and To-

fler, agreed that as represented to them, the levels of Stephens's physical exertion, emotional stress, diet, and cold were not substantial factors in bringing about his heart attack.[5] They agreed that coughing may have triggered the heart attack, although neither physician professed to know the cause of the cough. Dr. Raugust, an ear, nose, and throat specialist, stated that the cause of Stephens's coughing and laryngospasm was not the cold dry air of the North Slope, the dust, or the level of physical exertion, but was the phlegm produced by Stephens's smoking and chronic sinus disease. He testified that because of Stephens's smoking and sinus disease, this coughing episode would have occurred "anywhere in the world."

Thus, in reaching their conclusions that Stephens's heart attack was not work-related, the physicians took into account their understanding of his work conditions. Their understanding was based on a factually permissible interpretation of the work conditions.

 Drs. Mayer and Tofler agreed that if Stephens's work conditions differed from those that they considered (for example, if there were a higher level of physical exertion involved) the conditions might in fact have been a significant factor in causing his heart attack. *See supra* note 5. The existence of a potentially material, genuine fact dispute about Stephens's actual work conditions, however, does not mean the Board erred by ruling that ITT overcame the presumption of compensability. The physicians based their opinions on a state of facts, which, although disputed, could be permissibly resolved in favor of the employer. The physicians' conclusions favoring the employer, and the permissible fact assumptions underlying those conclusions, standing alone, constitute suffi-

gust, Stephens had a history of nasal injuries from athletics, a chronic cough, and a longstanding history of chronic sinusitis documented by x-rays.

5. Both doctors agreed that if there was an unusual level of physical exertion, emotional stress resulting from either time pressure or negative racial comments, or an extreme change in temperature, these factors could have contributed to Stephens's heart attack. In concluding that Stephens's employment did not contribute

substantially to his heart attack, neither doctor considered that these factors had been present. However, both doctors agreed that the Board should consider "the level of physical activity that [Stephens] engaged in that morning, how frequently he had engaged in that activity or similar activity in the past year or two, the time constraint on which he was under, the temperature, [and] the emotional stress" in determining whether Stephens's heart attack was work-related.

cient evidence to rebut the presumption of compensability. "It has always been possible to rebut the presumption of compensability by presenting a qualified expert who testifies that, in his or her opinion, the claimant's work was probably not a substantial cause of the disability." *Big K Grocery*, 836 P.2d at 942. "[I]t is not the function of this court to reweigh the evidence but only to determine whether such evidence exists." *Gillispie*, 881 P.2d at 1109 (quoting *Kessick*, 617 P.2d at 757). We give deference to the Board's determination of a witness's credibility. AS 23.30.122. Thus, we conclude that the Board's finding that ITT rebutted the presumption of compensability was based on substantial medical evidence which eliminated all reasonable possibilities that the heart attack was work-related.

### B. *Preservation of Remaining Issues*

■ ITT argues that the only question appealed to the superior court in September 1991 was the issue of whether the employer rebutted the presumption of compensability. ITT reasons that because Stephens did not raise any issues on cross-appeal in the superior court, he waived his right to raise those issues here.

Stephens arguably waived his right to appeal any issue other than whether ITT rebutted the presumption of compensability.[6] Nonetheless, we conclude that under the specific circumstances of this case, Stephens did not so clearly waive these remaining issues that we should not consider them.[7]

### C. *Preponderance of the Evidence*

■ After concluding that ITT had rebutted the presumption of compensability, the Board's March 1993 decision found that Stephens did not prove his claim by a preponderance of the evidence. The Board stated:

> Based on our conclusion that the defendants have submitted substantial evidence to overcome the presumption, we find the employee must prove his claim by a preponderance. Upon reviewing the entire record, including the medical evidence outlined above, we find he is unable to prove his claim. Accordingly, we find by a great weight of evidence that his claim for workers' compensation benefits must be denied.

Stephens argues that the Board erred in using the same analysis to decide both that ITT overcame the presumption of compensability and that Stephens was unable to prove

---

6. In its August 28, 1991 decision and order on reconsideration the Board stated:

> As we indicated in our June 20, 1991 decision and order, all the treating and examining physicians doubted the work-relatedness of the employee's myocardial infarction. Nevertheless because no doctor unequivocally stated that the work was not a "substantial factor" in causing the myocardial infarction, and based on our review of the Supreme Court's analysis in *Grainger II*, we conclude the petitioners have not rebutted the presumption of compensability. *In the event that any appellate court finds the presumption was overcome, however, based on the medical testimony in this case, we would find the employee did not prove the compensability of his claim by a preponderance of the evidence.* (Emphasis added.)

In September 1991 ITT filed its notice of appeal which stated that it appealed:

> only from that portion of the Board's decisions in which the Board found that appellants did not rebut the presumption of compensability. Appellants do not appeal from the finding in the Board's August 28, 1991 decision that had the presumption of compensability been rebutted, employee Edgar Stephens did not prove his claim by a preponderance of the evidence.

As he was clearly on notice that ITT was appealing only the Board's finding regarding the presumption of compensability, Stephens should have cross-appealed to preserve his own right to challenge any unfavorable aspect of what was otherwise a favorable decision. *See Andersen v. Edwards*, 625 P.2d 282, 285 (Alaska 1981) (refusing to consider argument because appellee did not file a cross-appeal and properly raise the issue).

7. The Board's August 1991 decision should be viewed as separate from its March 1993 postremand decision which considered the effect of our 1992 *Big K Grocery* opinion. The Board's March 1993 decision concluded that ITT successfully rebutted the presumption of compensability and that Stephens was unable to prove his claim by a preponderance of the evidence. Assuming the appellate process began anew when the Board issued its March 1993 decision, Stephens's superior court points on appeal preserved his remaining issues. Moreover, because the case technically ended when the Board found that ITT had not overcome the presumption of compensability, it was unnecessary for the Board's August 1991 decision to find conditionally that Stephens failed to prove his claim by a preponderance of the evidence.

his claim by a preponderance of the evidence. He asserts that the standards for making these two determinations differ because the evidence offered to overcome the presumption should be viewed in isolation.

Evidence offered by the employer to rebut the presumption of compensability is viewed in isolation and is not weighed against contrary evidence offered by the employee. In *Norcon, Inc. v. Alaska Workers' Compensation Bd.*, 880 P.2d 1051, 1054 (Alaska 1994), we explained that testimony is not weighed at the rebuttal stage. Thus, the physicians' testimony could be weighed only after the Board determined that the presumption had been overcome. *Id.; see also Wolfer*, 693 P.2d at 869 ("[T]he presumption [of compensability] shifts only the burden of production and not the burden of persuasion.").

■ The Board stated that "[u]pon reviewing the entire record, including the medical evidence outlined above, we find [that Stephens] is unable to prove his claim. Accordingly, we find by a great weight of evidence that his claim for workers' compensation benefits must be denied." Given the dispute about Stephens's work conditions, and the potential materiality of that dispute,

the Board did not make sufficiently specific findings. The Board did not discuss the work conditions dispute or even acknowledge the testimony of Stephens's co-workers regarding work conditions.[8] The Board's conclusory statement consequently does not permit adequate appellate review of its finding that the preponderance of the evidence did not support Stephens's claim. *See Hewing v. Alaska Workmen's Compensation Bd.*, 512 P.2d 896, 898 (Alaska 1973) (remanding because "findings of fact filed by the Board in regard to its disability determination do not permit us to intelligently review" the appellant's assertions). Therefore, we remand to the Board to make the appropriate findings regarding the weight of the evidence.

■ At oral argument before us, Stephens's counsel also argued that the Board's March 1993 decision failed to weigh the opinion of Dr. Lawrence Repsher, a consultant in diseases of the chest and critical care medicine. Dr. Repsher's testimony potentially supported Stephens's claim that the work conditions caused his heart attack.[9]

In a footnote, the Board's decision stated:

8. Although the decision summarized some of the evidence presented, it does not reflect any findings regarding Stephens's actual work conditions, discuss the evidence on that issue, or even mention that issue. Perhaps the Board implicitly found the work conditions to be as the medical experts assumed them to be. The failure to mention the issue leaves us without any confidence that the Board made any such implicit finding. Although it is true, as the dissenting opinion argues, that "an appellate court can readily review the testimony of these [expert] witnesses to determine whether it meets the substantial evidence standard," Op. at 20 (Matthews, J., dissenting), it is not clear whether the Board made the findings of fact essential to acceptance of the experts' testimony. A remand is consequently necessary.

9. Dr. Repsher was asked to give his opinion on whether the conditions of Stephens's employment contributed to the coughing episode that he suffered on the morning of May 4. He drew a distinction between Stephens's chronic underlying cough, and the acute coughing episode that Stephens suffered on the morning of the heart attack. Dr. Repsher wrote that "it is my opinion, to an overwhelming probability, that the acute onset of the cough was as a result of his acute myocardial infarction and not underlying the

cause of it." He cited three reasons for this opinion: (1) Stephens's chronic underlying cough was related to cigarette smoking as documented by Dr. Thieman; (2) Stephens smoked a cigarette before going to work on May 4; and (3) his cough was part of the initial constellation of symptoms, all of which are characteristic of an acute myocardial infarction. Dr. Repsher concluded that

his episode of coughing at 0900 hours on 4 May 1990 was not the result of working conditions while employed for ITT Felec Services as a rigger, but rather was the result of transient left ventricular failure due to a large inferior wall myocardial infarction and that therefore, the cough was the result of the myocardial infarction and not the cause of the myocardial infarction.

Dr. Repsher's testimony potentially supports Stephens's claim that his work conditions caused his heart attack and potentially contradicts expert medical testimony that Stephens's heart attack may have been caused by the coughing episode, and thus was not work-related. Consequently, Dr. Repsher's testimony is relevant to the critical issue of work relatedness, and should have been considered by the Board in deciding whether Stephens had proven his claim by a preponderance of the evidence.

We note the employee's argument that our IME physician, William Raphshire, [sic] M.D., concluded the coughing episode did not cause, but was caused by, the heart attack. In determining whether the presumption was overcome, however, we do not weigh his evidence in our consideration, but examine the opinions of qualified experts in isolation. *Wolfer*, 693 P.2d at 869.

It is unclear whether the Board, after determining that ITT had overcome the presumption of compensability, then gave any consideration to Dr. Repsher's opinion in deciding whether Stephens had proven his claim by a preponderance of the evidence. The Board may have considered Dr. Repsher's evidence in this context, but its decision does not say so. On remand the Board should indicate whether it has considered Dr. Repsher's opinion in deciding whether Stephens proved his claim by a preponderance of the evidence.

### D. *Independent Medical Evaluation*

Alaska Statute 23.30.095(k) states in relevant part:

In the event of a medical dispute regarding determinations of causation, medical stability, ability to enter a reemployment plan, degree of impairment, functional capacity, the amount and efficacy of the continuance of or necessity of treatment, or compensability between the employee's attending physician and the employer's independent medical evaluation, a second independent medical evaluation shall be conducted by a physician or physicians selected by the board from a list established and maintained by the board.

▉ Stephens argues that the Board erred in failing to order an independent medical examination (IME) under AS 23.30.095(k) regarding the cause of his heart attack. He argues that because the opinions of Drs. Donald Thieman and Tofler regarding the cause of his heart attack were in conflict, the Board should have ordered an IME.

ITT argues that the record provides no basis upon which the Board could have ordered an IME, because both Stephens's treating cardiologist, Dr. Mayer, and ITT's cardiologist expert, Dr. Tofler, concluded that the heart attack was not work-related.

Dr. Thieman is a general practitioner, not a cardiologist. In a letter to Stephens's attorney, Dr. Thieman stated:

From the history given by Mr. Stephens, his symptoms of myocardial infarction began in the course of vigorous physical exertion while he was on the job. In this sense there is a reasonable association between the physical work of his job and the acute precipitation of the myocardial infarction.

The other questions as to whether the physical and psychological stress of the job overall contributed to his heart disease, and as to whether diet on the job site was related to his heart disease would be much harder to demonstrate and I could not offer you any particular expertise in that area.

I would suggest if you wish to pursue the association between the acute physical exertion and the acute precipitation of the heart attack, that you obtain an appropriate expert witness in the area of cardiology, who can give an opinion as to the percentage of responsibility to assign to the acute physical exertion in causing the heart attack, as opposed to the probability that the heart attack would have occurred anyway at somewhere near the same time in the patient's life.

Thus, although Dr. Thieman saw a "reasonable association" between Stephens's physical work and his heart attack, he qualified his statement by recognizing his limited expertise in the area of cardiology, and suggested that Stephens "get an appropriate cardiology expert witness who has a more extensive knowledge on the subject" to pursue the association between the physical exertion and the heart attack. Because Dr. Thieman was not an expert in cardiology, had qualified his opinion based on that limitation, and had deferred to witnesses with expertise in cardiology, and because two cardiologists opined that Stephens's heart attack was not work-related, the Board did not abuse its discre-

tion by not requiring an IME regarding the cause of Stephens's heart attack.

### IV. CONCLUSION

We AFFIRM the Board's decision that ITT overcame the presumption of compensability. We REMAND to the Board to make appropriate findings regarding whether Stephens proved his claim by a preponderance of the evidence. We AFFIRM the Board's decision not to order an IME.

MOORE, C.J., not participating.

MATTHEWS, J., dissents.

MATTHEWS, Justice, dissenting in part.

I dissent from that part of the majority opinion which remands this case to the Board for additional findings on the question of whether Stephens proved the elements of his claim by a preponderance of the evidence. In my opinion the Board's decision contains adequate findings and no remand is necessary.

Findings are adequate when, at a minimum, they show that the Board considered each issue of significance, demonstrate the basis for the Board's decision, and are sufficiently detailed so that they afford an opportunity for meaningful judicial review. *See White v. Alaska Commercial Fisheries Entry Comm'n,* 678 P.2d 1319, 1322 (Alaska 1984); *Uchitel Co. v. The Telephone Co.,* 646 P.2d 229, 236 n. 16 (Alaska 1982); *Hewing v. Alaska Workmen's Compensation Bd.,* 512 P.2d 896, 898 (Alaska 1973). The findings made by the Board in this case satisfy these three purposes.

The main *issue of significance* here is whether Stephens's heart attack was work related. The Board considered this issue and found that Stephens had not proven his claim by a preponderance of the evidence. The Board *demonstrated the basis for its decision,* stating that its decision was founded on a review of the entire record "including the medical evidence·outlined" in the Board's written opinion. *Sufficient detail* was supplied as the Board summarized the testimony of Dr. Raugust, Stephens's treating otolaryngologist, Dr. Mayer, Stephens's treating cardiologist, and Dr. Tofler, ITT's cardiologist, and concluded, "uniformly, Drs. Raugust, Mayer, and Tofler agreed that the employee's work probably was not the cause of the employee's disability, but that it was caused by a non-work related condition." An appellate court can readily review the testimony of these witnesses to determine whether it meets the substantial evidence standard by which Board findings are tested.

Today's opinion states that the working conditions at the time of the heart attack were also a contested issue. As I read the record, what the physical conditions were, and what Stephens had done before the onset of the attack, were uncontested, although there is room for cavil as to matters of degree. In any case, the Board's composite decision discusses working conditions at length, showing that they were considered. Further, the circumstances which the Board accepted as true are apparent from the Board's decision. Finally, the detail of the Board's decision goes well beyond that employed by most judicial and agency fact finders and is more than sufficient to facilitate judicial review. To illustrate these points I quote in the margin at length from the Board's decision, emphasizing its discussion of work conditions.[1]

As a subsidiary holding the majority requires the Board to make findings indicating what, if any, weight it gave to the opinion of

---

1.

The employee's POW–2 work site consists of a radar facility known as a radome, which is a metal structure containing the radar apparatus, antennae, and control facilities. The dome itself is approximately 40–50 feet in diameter and rests on a rectangular structure known as a "plenum," which is approximately 50 feet square and 8 feet high. The plenum, which resembles a large room, is supported 50 feet above the ground by stilt-like columns at each corner. Between the floor of the plenum and the radar room at ground level is an enclosed spiral staircase used to travel between the radar room at ground level and the base of the plenum. To reach any work site within the interior of the radome from ground level, one must first climb a 9–10 foot ladder within the radar room to a spiral staircase 25–35 feet in height to the floor of the plenum. From that point, one walks horizontally about 20 feet across the floor of the plenum to another 8-foot ladder, which is then used to reach the floor of the radome. *Accordingly, from any work area on the floor of the radome to ground level, one must descend between 42 to 53 feet.*

The employee testified that he devoted the two days after his arrival at the site assisting in

the installation of an obstruction or warning light on the top of the radome, and running a wire from that light to a switch on the inner wall of the radome. On Thursday, May 3, 1990, the employee threaded that wire through a number of brackets, which he and a co-worker mounted on the inner wall of the radome. That work was indoor work, involved the use of a 40–foot wooden extension ladder and step-ladder, both of which were moved with the assistance of the employee and a co-worker, Matt Cowles, during the day. On each of the three days preceding his myocardial infarction, the employee completed work at 5:00 p.m. On each of the nights preceding his myocardial infarction, the employee retired at his usual time and slept normally.

On Friday, May 4, 1990, the employee arose, ate breakfast, and reported to work at his usual 8:00 a.m. time. *At approximately 9:00 a.m., he climbed up into the interior of the radome, where he worked in an almost sedentary fashion* in the vicinity of the switch he and Matt Cowles had installed two days before. *After approximately 15 minutes, the employee* determined he needed additional small plastic surface mounting clips for the wire he was installing through the switch, so he *descended approximately 40 to 53 feet through the series of ladders and the spiral staircase to get those parts. After retrieving the parts, the employee returned to the interior of the radome, completing that roundtrip in approximately five minutes.* He worked for an additional two to three minutes and found that the *clips were breaking because of the cold.* The employee then decided to use metal rather than plastic clips, and *again descended through the ladders and spiral staircase which connect the interior of the radome to the lower, ground level of the facility.*

At some point during or after descending to the radar room floor at ground level, the employee "started breaking out in a cold sweat" and started coughing. The employee was uncertain, however, if his symptoms began while descending the steps or once he had completed the descent. The employee testified that he could not breathe and felt that he "started strangling" from the mucous.

. . . .

The defendants submitted substantial amounts of medical testimony to show that the various activities engaged in by the employee at work did not substantially contribute to his myocardial infarction. For example, *Dr. Tofler and cardiologist William Mayer, M.D., testified they did not think the employee's act of climbing the radome, or the speed required to finish the task of replacing broken brackets, substantially contributed to the myocardial infarction. Similarly, they did not think the cold temperatures substantially contributed to the myocardial infarctions. Additionally, Dr. Tofler thought the stress the employee experienced when working with co-workers and supervisors who dislike him or who made him the target of racial re-*

*marks did not substantially contribute to the myocardial infarction.*

. . . .

[T]o eliminate the possible work-related factors as the cause of the heart attack, the petitioners rely on the following:

1. *The physical exertion required at the time of the heart attack was not unusual.* Dr. Mayer and cardiologist Geoffrey Tofler testified, however, that physical exertion could have been a factor in the myocardial infarction.

2. *The cold weather the employee experienced was not unusual.* Nevertheless, Dr. Tofler testified the cold temperatures could have increased the risk of heart attack. Dr. Mayer thought the employee might suffer from cold-induced recurrent asthma which could have caused the coughing episode at the time of the heart attack.

3. *The emotional stressors were not unusual.* The record reflects, however, the employee was subject to pressure due to time limitations, frustration from breaking parts, racial slurs and personality clashes with co-workers and a supervisor. Dr. Tofler thought these elements could be a factor in the employee's myocardial infarction.

4. A combination of the above factors did not play a "significant role" in causing the myocardial infarction. Nevertheless, Dr. Tofler testified that each or a "catastrophic convergence" of all the above factors could have played a role in the heart attack.

. . . .

According to Dr. Raugust, *the cause of the coughing and laryngospasm was not the cold, dry air of the North Slope, the presence of any dust in the air, or physical exertion, but the wad of phlegm in the employee's throat.* Dr. Raugust testified that because of the employee's smoking and sinus disease, this coughing episode would have occurred "anywhere in the world."

. . . .

*A. Cold Weather* [Board's emphasis.]

The employee testified that he worked as a rigger on a regular basis and was assigned to work at DEW line stations throughout his three-year employment with the employer. *The employee also testified that his job often caused him to climb up outdoor antennas, that he worked indoors and outdoors, and was able to acclimate himself to both work environments. The employee spoke directly with Dr. Tofler about his work in cold temperatures and indicated to Dr. Tofler that he had been exposed to significantly colder weather than he experienced on the morning of his myocardial infarction.*

With these facts in mind, Dr. Tofler testified that "to a reasonable degree of medical probability, I do not believe that the factors (including exposure to cold) occurring associated with his employment contributed substantially to the onset of the myocardial infarction." Dr. Mayer also testified that it was not likely that cold temperatures, as experienced by the employee, was a trigger for his myocardial infarction.

Dr. Repsher, noting that Dr. Repsher's testimony "potentially supported Stephens's claim that the work conditions caused his heart attack." In my view it is asking too much to require that findings specifically refer to the testimony of every witness who gives potentially significant testimony on critical issues. This goes beyond the level of detail necessary to satisfy the three purposes

**B. Physical Activity** [Board's emphasis.]

The employee testified that he worked as a rigger on a regular basis throughout his three-year employment with the employer. *The employee stated that his job required him to often climb up outdoor antennas "some of them as high as 300 feet, a lot of them around 100 feet." Climbing towers, stairs, ladders and stepladders was a regular part of the job of rigger. From speaking directly with the employee, Dr. Tofler testified that the employee's work activities before May 1990 were of a similar or more strenuous nature than they were on the day of his myocardial infarction.*

Dr. Mayer was also provided a description of the employee's work activities of May 4, 1990. *Dr. Mayer, himself, reenacted the level of the employee's May 4, 1990 activity.* Dr. Mayer testified that at no time did he feel that was an unusual level of physical stress that a normal person, even a person with some coronary disease, should not be able to do.

Similarly, Dr. Tofler read the employee's deposition, which describes, in detail, his employment history and his physical duties as a rigger for three years with the employer. Additionally, Dr. Tofler interviewed the employee in order to "completely understand" the condition on the morning of the myocardial infarction. *Dr. Tofler concluded that the employee's activity "was, at most, moderate for him;" "it was significantly less than had occurred on many of his previous work days."* Dr. Tofler reiterated that opinion at hearing, testifying that "the exertion that Mr. Stephens did was consistent with the usual amount of exertion that he had done on previous occasions ... it was not extraordinary exertion...."

Dr. Mayer testified that to a reasonable degree of medical probability, the employee's physical activities on May 4, 1990, were not a substantial factor in bringing about his myocardial infarction. Dr. Tofler testified that to a reasonable degree of medical probability, the employee's physical activities associated with his employment did not contribute substantially to the onset of his myocardial infarction.

**C. Emotional Stress** [Board's emphasis.]

of findings. Further, Dr. Repsher's testimony is collateral rather than central to the critical issue of work relatedness. It seems that his main finding was that Stephens's heart attack caused his coughing. This contradicted some of the testimony offered by the other physicians. However Dr. Repsher did not testify that the heart attack was work related.

Dr. Tofler testified that acute emotional stress could trigger the onset of a myocardial infarction. Nevertheless, after speaking with the employee, *Dr. Tofler concluded that there was no evidence of any specific statement or episode on the morning of the employee's heart attack which could trigger the heart attack and the lack of any evidence from the employee himself over his own reaction to such alleged statements.*

Dr. Mayer testified that nothing he has ever read, reviewed, or been told about this case, or learned from his experience, would cause him to believe that the employee's employment was substantial factor in bringing about the employee's myocardial infarction. Dr. Tofler testified that he considered emotional stress and concluded it did not play a significant role triggering the employee's myocardial infarction; it was not a substantial factor.

**D. A Catastrophic Convergence** [Board's emphasis.]

Dr. Tofler concluded that the employee's work was not a substantial factor in triggering the myocardial infarction after *consideration of* the "various factors which Mr. Croft asked you about, that is, *the level of physical activity, time (constraints), temperature, emotional stress and the other."* Dr. Mayer testified that there was nothing that he had been made aware of through Mr. Croft's letter to him, through anything else Mr. Croft may have sent him, through any conversations he may have had with Mr. Croft or anyone else, through his review of the documents in this case, or from any other source, that causes him to believe that the employee's employment or his activities involved in employment were, on May 4th, a substantial factor in bringing about his myocardial infarction.

As the author of medical journal articles on the subject, Tofler was familiar with the concept of "catastrophic convergence." Nevertheless, he concluded that to a reasonable degree of medical probability, the factors occurring associated with the employee's work did not contribute substantially to the onset of his myocardial infarction. Dr. Mayer testified that the employee's employment was

For the above reasons I would affirm the decision of the superior court which affirmed the decision of the Board.

not a substantial factor in bringing about his myocardial infarction.

(Emphasis added except as noted.)