**Gwen BOLIEU and Bodhmati Oliver, Appellants,**

v.

**OUR LADY OF COMPASSION CARE CENTER, Aetna Casualty and Surety Co., and the Alaska Workers' Compensation Board, Appellees.**

No. S–8528.

Supreme Court of Alaska.

July 30, 1999.

---

---

Charles W. Coe, Anchorage, for Appellants.

Allan E. Tesche, Russell, Tesche, Wagg, Cooper & Gabbert, Anchorage, for Appellees Our Lady of Compassion Care Center and Aetna Casualty and Surety Company.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Gwen Bolieu and Bodhmati Oliver appeal the Alaska Workers' Compensation Board's denial of benefits for treatment of rashes that they allegedly contracted while working at Our Lady of Compassion Care Center. The employees argue that the Board improperly limited its inquiry to whether they contracted staph A infections. Because we agree that the Board's inquiry was too narrow, we vacate the Board's ruling and remand for determination of whether the rashes, even if caused by a source other than staph A, were work related.

## II. FACTS AND PROCEEDINGS

Gwen Bolieu and Bodhmati Oliver worked as nursing assistants at Our Lady of Compassion Care Center (Our Lady), an Anchorage care facility for long-term, seriously disabled individuals. Bolieu started working for Our Lady in 1988; Oliver began in 1989. Both employees were responsible for such tasks as bathing patients and rendering oral care.

In July and August of 1990 Bolieu, Oliver, and seven other employees developed skin rashes and filed workers' compensation claims. The Director of Quality Management at Our Lady, Kathleen Lum, sent the employees to First Care Medical Clinic to see Dr. Scott Mackie. At no point did a physician come to Our Lady to investigate the employees' rash complaints.

In March and April of 1991 Bolieu, Oliver, and fourteen other employees again filed claims based on skin rashes.[1] On May 21, 1991, Bolieu and Oliver filed occupational illness reports with Our Lady, both citing "skin rash" as the nature of their injury. As a result, Our Lady sent both Bolieu and Oliver to see Dr. Mackie, who diagnosed Bolieu as having a probable case of impetigo and Oliver as having noninfectious dermatitis. In the summer of 1991 Bolieu and Oliver saw their treating physician, Dr. Michael Beirne, who diagnosed them both with staph A infections.[2]

Our Lady began paying Temporary Total Disability (TTD) benefits to Oliver in June 1991 and to Bolieu in July 1991. Oliver stopped receiving TTD benefits when she resigned from Our Lady in November 1991.

In January 1992 Bolieu was treated for an abscess on her breast. Dr. Danny Robinette of Elmendorf Hospital testified before the Board that the abscess was probably related to a staph infection[3] from which Bolieu suffered.

Our Lady then requested that both Bolieu and Oliver be referred to a series of infectious disease specialists for Independent Medical Evaluations (IMEs). In March 1992 Dr. Burton Janis confirmed that Bolieu tested positive for staph A but could not conclude whether or not the infection was work related. In July 1992 Dr. Janis stated that

---

1. Two of these employees were also part of the group that filed claims in July and August 1990.

2. Both Dr. Beirne and his physician's assistant, Kenneth Ryther, treated Bolieu and Oliver.

3. As several physicians explained at the hearing, staphylococcus bacteria can cause different types of infections, some of which are more dangerous than others. For example, staph aureus (staph A) is a more aggressive species than staph coagulase negative (staph negative). The physicians who examined Bolieu and Oliver differed in their description of the employees' infections; some diagnosed them as having "staph infections"; others made specific diagnoses of staph A or staph negative. We describe the diagnoses as they appear in the doctors' reports.

he did not believe Bolieu was ever medically unstable and that he did not think her lesions were work related. He noted that "up to 40% of normal people have staphylococcus aureus [staph A] in their nose." In response to Dr. Janis's report, Our Lady discontinued Bolieu's TTD benefits on August 31, 1992.

Dr. Janis verified that Oliver had resigned from Our Lady because of her skin disorders. Dr. Janis diagnosed Oliver with an infection "probably associated [with a] staphylo[co]ccal species" and possible allergic condition. Dr. Janis stated his belief that Oliver's skin condition was not work related and that she was medically stable on or before March 2, 1992.

Based on Dr. Janis's evaluations, Our Lady sent a controversion notice to Bolieu in September 1992 and to Oliver in December 1992 denying future benefits to both employees. In response, Bolieu and Oliver, through counsel, each filed an Application for Adjustment of Claim alleging that they contracted work-related staph infections.[4] Bolieu listed the nature of her injury in her Application for Adjustment of Claim as "staph infection"; Oliver listed hers as "skin rash."

Bolieu and Oliver saw another specialist, Dr. Paul Roberts, for an IME in January 1994. Dr. Roberts reported that Bolieu suffered from "[r]ecurring crops of papular pruritus" that might be treatable by a dermatologist. He also stated that although he could not tell whether Bolieu was still suffering any ill effect from the staph infection, she had not received adequate therapy for it up until that point. Nevertheless, he found "no medical reason to restrict Ms. Bolieu from her prior employment as a nurse's aide." With respect to Oliver, Dr. Roberts stated that she was medically stable and that her lesions were gone.

The Board sent Bolieu and Oliver to Dr. Elaine Jong for a second independent medical examination[5] in June 1994. Dr. Jong stated that she did not believe Bolieu suffered from a recurrent staph A infection and that to determine whether Bolieu had a different work-related infectious condition "one would have to review other records relating to the health of patients [at Our Lady]." Dr. Jong concluded that Bolieu became medically stable as of January 13, 1992. Dr. Jong stated her opinion that Oliver was medically stable in November 1991, and that Oliver might have an allergic condition requiring future treatment. Dr. Jong did not believe that either employee's condition was related to her employment at Our Lady.

In May 1995 Our Lady filed a petition to dismiss both employees' claims on the grounds that the injuries were not work related. The Board conducted a hearing in December 1996. In its February 1997 decision, the Board framed the issue as "[w]hether the employee[s] contracted Staphylococcus aureus coagulase positive (Staph A) from [their] employment with the employer." The Board denied both Bolieu's and Oliver's claims, finding that "the employee[s] did not contract Staph aureus while working for the employer."

Bolieu and Oliver consolidated their cases in April 1997. In January 1998 the superior court affirmed the Board's ruling, stating that "substantial evidence supports the Board's finding that Bolieu and Oliver did not contract [staph A] at the Center." Bolieu and Oliver appeal.[6]

## III. DISCUSSION

### A. Standard of Review

■ We independently review a Workers' Compensation Board's decision to deny or award benefits. "Because the superior court acted as an intermediate court of appeal, we give no deference to its decision."[7]

■ Generally, we will uphold the Board's decision "if substantial evidence ex-

---

4. Neither Oliver nor Bolieu specified what type of staph (staph A, staph negative, etc.) they thought they had.

5. See AS 23.30.095(k).

6. In a related personal injury suit against Our Lady, *Bolieu v. Sisters of Providence in Washington*, 953 P.2d 1233, 1241 (Alaska 1998), we addressed the question of whether Our Lady owed the spouses of nursing assistants a duty to take reasonable steps to minimize the spread of infectious disease.

7. *Meek v. Unocal Corp.*, 914 P.2d 1276, 1278 (Alaska 1996) (citing *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 528 (Alaska 1993)).

ists to support the Board's findings of fact."[8] We define substantial evidence as "that which a reasonable mind, viewing the record as a whole, might accept as adequate to support the Board's decision."[9] We do not independently reweigh the evidence on appeal; rather, we only determine whether such evidence exists.[10]

### B. The Board Erred by Failing to Include Possible Rash Causes Other Than Staph A in Its Inquiry.[11]

Bolieu and Oliver argue that the Board erred by failing to consider the possibility that they suffered from a work-related rash caused by a source other than staph A. In its Decision and Order as to Bolieu and Oliver's claims, the Board described the sole issue as "[w]hether the employee[s] contracted Staphylococcus aureus coagulase positive [staph aureus] from [their] employment with the employer." Throughout its findings of fact and conclusions of law, the Board applied its legal analysis solely to the "link between working for the employer and the condition of Staph aureus." The Board's ultimate conclusion was that neither Bolieu nor Oliver "contract[ed] Staph aureus while working for the employer." The Board thus limited its inquiry to whether the skin rashes were caused by staph A, rather than the broader question of whether the rashes were work related regardless of their cause.

Our Lady claims that the Board found that the employees' claims were solely based on a diagnosis of staph A and that substantial evidence supports this finding. But the Board made no such finding; the only reference in the Board's decisions to the scope of the employees' pleadings is the Board's acknowledgment that Oliver described her condition as a "rash on arms & stomach" diagnosed as "Dermatitis Atopic." Thus, we cannot apply the "substantial evidence" test to this issue.[12] Instead, we must decide the legal question of whether the Board erred by failing to address other possible work-related causes of the employees' rashes.

Although we have not yet had occasion to articulate a standard for determining whether the Board erred in failing to make findings of fact with respect to alternative work-related causes of injury, other courts that have considered the issue have looked to (1) whether the Board failed to decide a material and contested issue; and (2) whether the difference between what the employees pled and what they offered as proof during the hearing was so great as to be fatal to their claims.[13]

### 1. The employees raised a material and contested issue as to whether they suffered from a work-related rash caused by a source other than staph A.

■ When an employee makes a claim for compensation, the Board "may hear and

8. *Yahara v. Construction & Rigging, Inc.*, 851 P.2d 69, 72 (Alaska 1993) (citing *Morrison v. Afognak Logging, Inc.*, 768 P.2d 1139, 1141 (Alaska 1989)).

9. *Id.* (citing *Morrison*, 768 P.2d at 1141).

10. *See Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 624 (Alaska 1996).

11. Our Lady also briefed the issue of whether substantial evidence supports the Board's finding that Bolieu and Oliver did not have work-related staph A infections. Rather than arguing this point, the employees merely claim that the substantial evidence test cannot be applied to the Board's *lack* of findings on other potential work-related sources.

We conclude that substantial evidence does support the Board's ultimate finding that the employees did not suffer from work-related staph A infections. The Board determined that the findings of Drs. Janis, Roberts, and Jong were

more persuasive than those of Dr. Beirne, the family physician who diagnosed the employees with staph A. This is the type of credibility determination that lies squarely within the province of the Board. *See Hodges v. Alaska Constructors, Inc.*, 957 P.2d 957, 963 (Alaska 1998) (noting that the Board has authority to choose between conflicting medical testimony).

12. Even if the Board had made an implicit finding that the employees based their claims solely on staph A, such a finding would not meet the "substantial evidence" test given our ultimate conclusion that the record as a whole indicates the employees' claims were not limited to staph A. *See infra* at IV.A.2 (concluding that the record, as a whole, indicates that the employees' claims were not limited to staph A).

13. *See* 7 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 77A.40–45 (1998) (discussing when unpled claims raised at a later stage of the process are still valid).

determine all questions in respect to the claim."[14] The Board need only make findings with respect to issues that are both material and contested.[15] When the Board fails to make a necessary finding, we cannot fill the gap by making our own determination from the record; we must remand to the Board.[16]

Here, the question whether Bolieu's and Oliver's rashes were caused by a non-staph A source that was work related is a material issue. An issue is material in a workers' compensation dispute if it "affect[s] the right to compensation."[17] If the Board had determined that Bolieu's and Oliver's rashes were caused by a work-related non-staph A source, it presumably would have awarded compensation.

We also conclude that Bolieu and Oliver have created a contested issue as to whether their rashes were work related and caused by a source other than staph A. To contest an issue, a claimant must produce some evidence beyond mere assertions. We agree with the formulation used by the District of Columbia Court of Appeals in reviewing workers' compensation boards' decisions:

> For purposes of ... deciding whether the issue was truly a contested one, we must examine the record to determine if there are sufficient indicia of factual development on the point in contention ... more than a bald assertion of a theory of recovery for which the record contains no evidentiary basis of support.[18]

The record in this case does contain such evidence of potentially work-related causes of the employees' rashes other than staph A. First, the fact that at least twenty-one employees developed rashes at the same time, though not conclusive, reasonably supports a theory that the rashes were work related.[19] Second, Dr. Jong, the infectious disease specialist whom the Board asked to perform a second independent medical examination, noted the possibility that a source of Bolieu's rashes other than staph A might have been work related:

> These two diagnoses [scabies and impetigo] could have been possibly related to conditions present in the workplace, and are concerns among healthcare workers with close patient contact. However, one would have to review other records relating to the health of patients that Gwen Bolieu cared for at the time of the onset of her skin problem, to see if this hypothesized chain of infection can be linked.

Dr. Jong concluded that "the etiology of [Bolieu's] skin lesions is not clear."

Dr. Jong concluded that Oliver did not have a work-related infectious condition at the time of the examination but might have "an underlying allergic condition which might predispose her to infectious and non-infectious skin lesions." She suggested that Oliver seek treatment from an allergist and a dermatologist "so that her condition can be meticulously documented" if her lesions continued. Dr. Jong did not comment on whether such a noninfectious condition could have been work related.

Of course, the fact that the cause of an employee's injuries is unknown is not sufficient to label an employer's proffered medical evidence as inconclusive or contested. In *Norcon, Inc. v. Alaska Workers' Compensation Board,*[20] we cautioned that such a result would create an "irrebuttable presumption"

---

14. AS 23.30.110(a).

15. *See Stephens,* 915 P.2d at 627 (remanding because, "[g]iven the dispute about [the employee's] work conditions, and the potential materiality of that dispute, the Board did not make sufficiently specific findings"); *see also Davis v. District of Columbia Dep't of Employment Servs.,* 542 A.2d 815, 819 (D.C.1988) (concluding that a remand was necessary in part because the Workers' Compensation Board failed to make findings on a material and contested issue).

16. *See Stephens,* 915 P.2d at 627; *see also Davis,* 542 A.2d at 819.

17. *McCormick on Evidence* § 185 (John William Strong ed., 4th ed., 1992).

18. *Davis,* 542 A.2d at 820.

19. Evidence of work-relatedness need not consist solely of medical or scientific testimony. *See, e.g, Beauchamp v. Employers Liab. Assurance Corp.,* 477 P.2d 993, 996 (Alaska 1970).

20. 880 P.2d 1051 (Alaska 1994).

against the employer whenever the claimant suffers an injury whose cause is difficult to diagnose.[21] But in concluding that the Board erred in ruling against Bolieu and Oliver, we do not rely on Our Lady's failure to identify the exact cause of their rashes. Rather, we rely on the Board's failure to make reviewable findings of fact concerning evidence suggesting the existence of work-related causes other than staph A.

2. *The variance between the employees' pleadings and proof was not fatal to their non-staph A claims.*

 We must also address whether Bolieu's and Oliver's description of their injuries in their benefit claims was so different from their recovery theory at the hearing as to preclude their receipt of benefits for anything other than staph A-related injuries. We have not previously addressed the issue of variance between pleadings and proof in workers' compensation cases. The employees argue that courts traditionally allow wide latitude between pleadings and proof in workers' compensation cases. In most of the cases they cite on this point, courts upheld a board's decision to grant benefits for an injury different from that alleged in the original claim.[22] Although these cases are relevant, they do not establish that a board *must*, as a matter of law, allow evidence of such related injuries when not explicitly included in the claims for compensation.

When courts have affirmed a denial of benefits based on variations between pleadings and proof, the main concern appears to be with claimants attempting to take a "second bite at the apple"[23]—or, as Our Lady describes it—attempting to "resuscitate" rejected claims. Here, Bolieu's and Oliver's non-staph A claims are not merely attempts to advance eleventh-hour recovery theories. On the contrary, the record, both in the hearing transcript and in documents the employees submitted to the Board before and

after the hearing, reflects that Bolieu and Oliver did make clear they were seeking compensation for their skin rashes, whatever the cause.

The employees' initial claims were for skin rashes, not for staph infections. In their reports of occupational injury, both women described the nature of their injuries as "skin rash" and listed the causes of the rash as something other than staph A—Oliver listed dermatitis and Bolieu listed impetigo. Upon receiving Dr. Janis's report concluding that the employees' skin conditions were not work related, Our Lady sent both women a controversion notice. The notice sent to Bolieu listed her injury as "recurrent staph infection"; the one sent to Oliver listed her injury as "dermatitis/staph infection." In response, each woman filed an Application for Adjustment of Claim. In these applications, Bolieu listed her injury as a "staph infection" and Oliver described hers as a "skin rash" caused by contracting staph.

The employees most likely shifted from the general to the specific in labeling their injury because they had been diagnosed with staph A infections both by Dr. Mackie, whom Our Lady first sent them to see, and by Dr. Beirne, their treating physician. Bolieu and Oliver did not *change* their claim from a skin rash to some other type of injury; rather, they merely used more precise language—based on a physician's advice—in their Applications for Adjustment of Claims to describe what they believed caused their injuries. The underlying injury—skin rash and lesions—remained constant in all of the employees' claims, reports, and pleadings.

Bolieu and Oliver also asserted throughout the hearing process their right to compensation for their rashes and lesions, whatever the cause. In their pre-hearing brief submitted to the Board, the employees defined the issue to be determined as "causation of their injuries." The employees complained that

---

21. *See id.* at 1055 n. 4; *see also Safeway, Inc. v. Mackey*, 965 P.2d 22, 28 (Alaska 1998) (citing *Norcon* with approval).

22. *See National Auto. & Cas. Ins. Co. v. Industrial Accident Comm'n*, 95 Cal.App.2d 10, 212 P.2d 1, 2–3 (1949); *Bassemier v. W.S. Young Constr. Co.*, 110 So.2d 766, 768 (La.App.1959); *Ruso v. Beverwyck Breweries, Inc.*, 276 A.D. 878, 93 N.Y.S.2d 845, 846–47 (1949); *City of Altoona v. Workmen's Compensation App. Bd.*, 50 Pa. Cmwlth. 178, 411 A.2d 1322, 1323–24 (1980).

23. *Davis*, 542 A.2d at 821.

opposing counsel had "only viewed these cases for Staph A, not as to the nature and extent of the on-going rashes or other staph variations."

At the hearing, the employees' attorney limited neither his examinations nor his arguments to the staph A issue; instead, he focused on the nature and cause of the skin conditions generally.[24] Indeed, even Our Lady's attorneys identified the issue as being broader than whether the employees contracted staph A.[25] The employees stated in their written closing argument to the Board that they sought compensation for their rashes even if such rashes were not caused by a staph A infection.[26]

The ultimate concern underlying this rule against claimants taking a "second bite" is that the employer will be prejudiced by insufficient notice of a worker's claim. Larson notes in his treatise that "if the variance is so great that the defendant is prejudiced by

having to deal at the hearing with an injury entirely different from the one pleaded, the variance may be held fatal." [27] In nearly all the cases Larson cites for examples of such fatal variances, the employee attempted to offer proof of injury to a different body part.[28]

Here, Our Lady made no objection at the hearing to lack of notice regarding other causes of the rash besides staph A.[29] And Our Lady was alert to the employees' claim that the rashes might have been caused by something other than staph A; Our Lady's attorneys questioned physicians at the hearing about the possibility of the employees having a different infectious or noninfectious skin condition. Although such questioning should not by itself be sufficient to prove that the employer had proper notice of a claim, it does discount Our Lady's argument that Bolieu and Oliver were merely trying to "resus-

24. Bolieu and Oilver's counsel, Charles Coe, described the employees' duty as proving that the workplace was the "cause of the skin conditions"; noted the possibility that coworkers were suffering from similar conditions but not necessarily staph A; noted the possibility of a staph *negative* infection; disputed Our Lady's assertion that staph A was the only claim; explained that Bolieu and Oliver had "probably more than one type of condition" related to employment; argued that, *in addition to* other conditions, both women had staph infections; called the employees' condition "infectious dermatitis"; and cross-examined Dr. Janis about the "recurrent eruption[s]" of "questionable cause."

25. Our Lady's attorneys, Allan Tesche and Dr. Lee Glass, described the relevant issue as "whether or not either applicant has any sort of infectious disease or noninfectious problem after the date of medical stability related to their employment … regardless of the source" and argued that "whatever the conditions claimed by both applicants, whatever their source may be, … the Board doesn't need to address the source of that." Tesche urged the Board "to ask … about staph, *Staph a.*, red bumps, itchy bumps, any of the conditions that Mr. Coe and his clients bring to the Board for resolution." Dr. Glass also asked Dr. Janis about other diseases besides staph A, and asked Dr. Roberts whether any infectious or noninfectious condition, including but not limited to staph A, was related to the employees' work at Our Lady.

26. The employees requested that the Board look beyond staph A as a possible cause:

This [coworker and patient contact] is the common source whether it is infectious or derma[to]logical in origin. Even if it is not infectious in origin[, that fact] does *not* rule out that it is not work related in origin. The disease that Ms. Oliver and [Ms.] Bolieu have can still be work related even if it is a rash obtained from a detergent, change in soap, or other institutional materials. They do not rule these factors out.

The employees also stated in their closing argument that they were not filing "claims for Staph A but generically for their rash conditions." The closing argument contained an entire subsection titled "Staph A vs. Rash" in which the employees argued that rashes, not merely staph A, were at issue. The employees concluded by telling the court: "Do not be mislead [sic] in this case. It is not about Staph A nor fully about an infectious disease. It is about a work related skin condition."

27. Larson & Larson, *supra* note 13, § 77A.45.

28. *See, e.g., id.* (citing *Sun Control Tile Co. v. Industrial Comm'n*, 117 Ariz. 268, 571 P.2d 1064 (App.1977) (disallowing award of benefits where claimant originally reported a knee injury and sought benefits at the hearing for a subsequent unreported back injury)).

29. AS 23.30.100 requires employees to give notice to their employer of the "time, place, nature, and cause of the injury." Failure to give notice does not bar claims "unless objection to the failure is raised before the board at the first hearing of a claim for compensation in respect to the injury." AS 23.30.100(d)(3).

citate" their claims with new recovery theories.

Additionally, this court has held that a layperson "should not be expected to diagnose a condition which physicians whom he had consulted ... failed to diagnose."[30] Bolieu and Oliver's use of the term "staph A" to describe their skin rashes was a direct result of several doctors' diagnoses. If such diagnoses turned out to be wrong, but the employees also presented evidence that the skin rashes could have been caused by one of several different work-related sources, then the employees should not be denied a hearing on their non-staph A claims merely because they sometimes referred to their injuries as staph A infections.

In an analogous case, *Davis v. District of Columbia Department of Employment Services*,[31] the D.C. Court of Appeals held that the Board's failure to consider evidence of alternative injury causes was reversible error. In *Davis*, a bus driver filed a claim for injuries he sustained when he slipped on ice while boarding his bus.[32] Specifically, he claimed he had a rare disease called "stiff-man syndrome" as a result of the fall.[33] During closing arguments, the driver claimed that he also suffered from back strain as a result of the fall.[34] The parties conducted post-hearing depositions of several other physicians, most of whom agreed that the employee suffered from back strain but could not identify the cause.[35] Nonetheless, the hearing examiner determined that the employee "sought compensation *only* on the basis of a fall-produced ... stiff-man syn-

drome" and refused to consider any other issue or cause of injury.[36]

The *Davis* court reversed the hearing examiner's decision, holding that the examiner should have considered the "material, contested" issue of whether the back strain was work-related.[37] The court found it significant that the employee had raised the "new" recovery theory in good faith based on the evidence:

> [S]nippets in the record suggest that the parties and the hearing examiner may have agreed among themselves ... that petitioner's case would rise or fall on the issue of stiff-man syndrome. This is not, however, a case where the petitioner, having seen the proposed compensation order and realizing his failure to convince the examiner that compensation was due, attempted to take a second bite at the apple by advancing a new theory of recovery.... Rather, the instant case is more akin to a proceeding in which the hearing examiner failed to consider an issue raised during the hearing itself.[38]

Our research uncovers no case in which a court either vacated an award or affirmed denial of benefits for an injury on the grounds that only the *cause* of injury on the written claim differed from that advanced by the claimant at the hearing. In fact, at least one court has held that, when the variance between pleading and proof relates only to the medical cause of the injury, the variance is not material.[39] This proposition rests on the notion that when an employee claims a general disability, regardless of whether the

---

30. *W.R. Grasle Co. v. Alaska Workmen's Compensation Bd.*, 517 P.2d 999, 1004 (Alaska 1974) (quoting *Employers' Liab. Assurance Corp. v. Bradshaw*, 417 P.2d 600, 601 (Alaska 1966)); *see also id.* at 1005 n. 17 ("It is unreasonable to conclude that an injury is not latent merely because the plaintiff suffered pain, when thereafter several physicians were unable to correctly diagnose his injury.").

31. 542 A.2d 815 (D.C.1988).

32. *See id.* at 816.

33. *See id.* at 816 & n. 2.

34. *See id.* at 818.

35. *See id.* at 817–18.

36. *Id.* at 816.

37. *Id.* at 822.

38. *Id.* at 820–21 (citations and quotations omitted).

39. *See Travelers Ins. Co. v. Strech*, 416 S.W.2d 591, 594–95 (Tex.Civ.App.1967) (holding that, although original diagnosis of heart attack was incorrect, employee's assertion of a new cause at the hearing was proper because the employee's description of the nature of his symptoms and disability remained constant throughout the claim and pleadings).

medical cause is unknown, the employer is on notice to investigate whether the disability is work related.[40]

### C. The Board's Error Was Not Harmless.

 Even if the Board should not have limited its inquiry to whether Bolieu and Oliver had work-related staph A infections, such an error would be harmless if Our Lady's previous payment of TTD benefits to Bolieu from July 1991 to August 1992 and to Oliver from June to November 1991 was sufficient to compensate them for any work-related injuries they ultimately proved.

 Injured employees may receive TTD benefits if they are totally disabled for a temporary period of time.[41] Once an employee is disabled, the law presumes that the employee remains disabled until the employer produces substantial evidence to the contrary.[42] The employer must pay TTD benefits until the claimant reaches the point of medical stability,[43] defined as "the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment." [44]

Further payment by Our Lady to the employees would be unnecessary if the Board made a finding, supported by substantial evidence, that Bolieu and Oliver were medically stable, whatever the cause of their injuries, prior to the dates Our Lady stopped paying their TTD benefits.[45] But the Board made no such finding.

In the "evidence" section of its Decision and Order, the Board noted both Dr. Janis's and Dr. Jong's findings as to the dates when the employees reached medical stability. But the Board's discussion of the doctors' findings does not constitute adoption of those findings; its discussion also included an analysis of Dr. Beirne's testimony, which supported the staph A theory and most of which the Board eventually discounted. In its findings of fact, the Board noted its agreement with Drs. Janis, Roberts, and Jong that the employees did not suffer from work-related staph A infections but the Board did not address the dates of medical stability. Indeed, considering that Dr. Janis and Dr. Jong disagreed as to the dates of medical stability,[46] the argument that the Board adopted both of the doctors' assessments as findings of fact is untenable.

Even if the Board's references to the specialists' opinions constitute findings of fact on medical stability, it is unclear whether those findings are supported by substantial evidence and whether they apply only to staph A. Both Dr. Janis's and Dr. Jong's determinations of medical stability could be read to encompass other possible causes of the rashes. But the Board's analysis is so entirely focused on staph A that it is difficult, if not impossible, to determine whether the Board would also have found the employees medically stable with respect to a condition such as noninfectious dermatitis—an illness presumably having an entirely different course of treatment than staph A.

Because the Board did not make a finding that Bolieu and Oliver were medically stable

40. See id. at 594.

41. See AS 23.30.185.

42. See Olson v. AIC/Martin J.V., 818 P.2d 669, 672 (Alaska 1991).

43. See AS 23.30.185.

44. AS 23.30.395(21).

45. Our Lady paid TTD benefits to Oliver from June 20, 1991 to November 25, 1991, one day before she quit her job. Our Lady paid TTD benefits to Bolieu from July 11, 1991 to August 31, 1992, terminating payment shortly after receiving Dr. Janis's report.

46. Dr. Janis concluded that Bolieu had never been medically unstable, while Dr. Jong estimated that she became stable on January 13, 1992. Dr. Janis estimated that Oliver was medically stable on or before September 21, 1992. Not only is this date potentially inconsistent with Dr. Jong's estimate of November 19, 1991, but it also is potentially several months after Our Lady stopped paying Oliver TTD benefits. Thus, even if the Board had adopted Dr. Janis's estimate as a finding of fact, a remand would be necessary to determine whether Oliver's rash was work related.

whatever the cause of their condition, we cannot determine whether Our Lady has sufficiently compensated the employees for their injuries. Thus, the Board's error in focusing solely on staph A was not harmless.

## IV. CONCLUSION

Because the employees adequately raised the material and contested issue of compensation based on alternative infectious and noninfectious causes of their skin rashes, we REMAND the case to the Board for redetermination of the claims based on such alternative causes.