Chris WOLLASTON, Appellant,

v.

SCHROEDER CUTTING, INC.,
and Wausau Insurance
Co., Appellees.

No. S–9520.

Supreme Court of Alaska.

March 1, 2002.

Rehearing Granted in Part April 9, 2002.*

Michael J. Jensen, Debra Fitzgerald, Law Offices of Michael J. Jensen, Anchorage, for Appellant.

Robert J. McLaughlin, Mann, Johnson, Wooster & McLaughlin, P.S., Tacoma, Washington, for Appellees.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

Chris Wollaston was injured on June 27, 1996, when he stepped in a hole, landed on the ball of his right foot, and bent his toes sharply upward, feeling a tear in the back of his heel. At the time of the injury he was working as a logger for Schroeder Cutting, Inc., at a logging camp at Hobart Bay. Wollaston could not work the next day and left camp the day after that. He was treated for the injury on June 30, 1996, by Dr. Riederer, a family practitioner in Juneau. Dr. Riederer diagnosed Wollaston as having a ligamentous injury—a mild to modest ankle sprain—with no evidence of fracture. Dr. Riederer noted that Wollaston might "need [an] estimated 7–10 days off if modified work [was] not available."

Wollaston moved to Texas where he was seen on August 1, 1996, and January 21, 1997, by Dr. Whittemore, an orthopedic specialist. Dr. Whittemore diagnosed a sprain or stretching of the ligaments at the back of the ankle. After the January 1997 visit, Dr. Whittemore noted some improvement but not to the extent that Wollaston could return to work as a logger. Dr. Whittemore opined that Wollaston had a permanent partial impairment of four percent.

* Eastaugh and Carpeneti, Justices, dissent from this order. They would grant the petition in all respects.

   Eastaugh, Justice, filed the following statement, with which Justice Carpeneti agrees:

     I dissent from that part of the order denying the petition for rehearing. The reasons for my

disagreement are expressed in my published dissent. Moreover, although I do not object to the correction which the court appropriately makes to footnote 1 for the purpose of accurately describing the analysis required in such cases, I am unable to reconcile that analysis with the result the court reaches here.

Wollaston had previously injured his right ankle on December 13, 1995, in a basketball game. He jumped and came down on another player's foot, dislocating his ankle. The dislocation was reduced at a hospital emergency room and the ankle was placed in a cast-splint device. About two months later, on February 21, 1996, Wollaston returned to work as a logger for Schroeder Cutting in Hobart Bay. There is conflicting testimony concerning the extent of Wollaston's recovery from the December 1995 injury. Wollaston and five witnesses testified that he was not limping and had no evident problems after the first injury. But two employees of Schroeder Cutting and the company's owner testified that Wollaston walked with a limp from the time he returned to work until the time he left Hobart Bay in late June.

Wollaston sought lost time benefits from the date of the injury until September 9, 1996, when he went to work as a cabinet maker, and permanent partial disability benefits based on continuing problems with his ankle. A hearing was held before the Workers' Compensation Board on September 15, 1998.

Dr. Whittemore's deposition testimony was presented at this hearing. Dr. Whittemore testified based on his treatment of Wollaston and his review of the records of the earlier injury, that the June 1996 injury was a substantial factor in bringing about Wollaston's residual ankle disability. He differentiated the June work-related injury from the December 1995 injury, noting that the ligaments that were stretched or torn in the work injury were different from those that were affected by the basketball injury.

Dr. Riederer also testified at the hearing. He stated that when he observed Wollaston he did not anticipate that there would be any permanent adverse residual effects from the fall, and that his opinion was that the disability would last no more than ten days.

The board decided that the June 27, 1996 injury was compensable through July 7, 1996. But the board also concluded "[b]ased on Dr. Riederer's testimony," that after July 7, 1996, "the defendant had presented substantial evidence to overcome the presumption of compensability." The question presented in this appeal is whether Dr. Riederer's testimony constitutes substantial evidence [1] rebutting the presumption of compensability for the period after July 7, 1996. We answer this question in the negative.

Dr. Riederer's testimony was predictive based on a fixed past perspective. He saw Wollaston only on June 30, 1996, and based on this visit predicted that the consequences of the June 27 injury would clear up in seven to ten days. Dr. Riederer's testimony never progressed from predicting Wollaston's course of recovery from the perspective of the June 30 visit, to a current expression of opinion as to Wollaston's actual condition or its causes. But he did make it clear that his June 30 prediction could be wrong and if it was a specialist should be consulted.[2] He did

---

**1.** We will affirm the board if "substantial evidence exists to support the Board's findings of fact." *Kolkman v. Greens Creek Min. Co.,* 936 P.2d 150, 154 (Alaska 1997) (quoting *Yahara v. Construction & Rigging, Inc.,* 851 P.2d 69, 72 (Alaska 1993)). Substantial evidence is "that which a reasonable mind, viewing the record as a whole, might accept as adequate to support the Board's decision." *Id.*

We independently review the evidence to ascertain whether the Board properly found that the employer presented substantial evidence to rebut the presumption of compensability. [*Veco, Inc. v. Wolfer,* 693 P.2d 865, 869 (Alaska 1985).] Because the presumption shifts only the burden of production and not the burden of persuasion, we examine the evidence tending to rebut the presumption by itself. *Id.*
*Childs v. Copper Valley Elec. Ass'n,* 860 P.2d 1184, 1189 n.5 (Alaska 1993).

**2.** The following excerpts illustrate the nature of Dr. Riederer's testimony:

A   I didn't think it was going to put him out of commission. Like I said, I—from that deci-

sion at that day looking at that man, and if I'm wrong—my guesses aren't always wrong, but I would think that looking back at—if I had to face that injury today in you or anyone, I think that it—and with the same findings, that I would be of my same opinion. I don't know maybe whether if he hasn't been able to, but that—given that same set of circumstances, I think I'd make the same call.

Q   One of your findings was—or conclusions is in response to the question, will injury result in permanent impairment. Do you feel that the stepping in the hole incident resulted in a permanent impairment of this man's right ankle?

A   I did not anticipate that, but had that man been in town and he was having trouble, I wouldn't have given him another month. I would have made arrangements for him to see one of the orthopedists in town at that point.

Q   But based upon what you observed on June 30, you didn't feel that the injury was going to result in permanent impairment?

A   I did not anticipate any permanent residual.

Q   Well, he has been rated with a permanent impairment, 10 percent of the lower extremity,

not testify that Wollaston did not have longer lasting consequences caused by the work-related injury and thus did not contradict Dr. Whittemore's testimony that the work-related injury has had a residual effect.

Under AS 23.30.120(a) a claim is presumed to be compensable.[3] The burden is on the employer to prove noncompensability through substantial evidence.[4] We held in *Grainger v. Alaska Workers' Compensation Board* that an employer can overcome the presumption of compensability "by presenting substantial evidence that either (1) provides an alternative explanation which, if accepted, would exclude work-related factors as a substantial cause of the disability; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability."[5] We added in *Big K Grocery v. Gibson* that an employer may "rebut the presumption of compensability by presenting a qualified expert who testifies that, in his or her opinion, the claimant's work was probably not a substantial cause of the disability."[6]

Dr. Riederer's testimony did not satisfy any of these formulations. He did not exclude the June 1996 work-related injury as a cause of Wollaston's continuing problems. Likewise he said nothing that directly eliminated any reasonable possibility that the work-related injury had consequences beyond July 7. Finally, Dr. Riederer did not

> four percent of the whole person, by Dr. Whittemore in Texas. Do you have an opinion on whether that impairment relates to the stepping in the hole incident or the dislocation incident?
>
> A  I—I—impairment ratings may vary from expert to expert. I'm sure you're aware of that, and I wouldn't comment on that. I think someone else may rate him entirely differently.
>
> . . . .
>
> Q  Do you understand what it takes to give rise to a permanent impairment?
>
> A  No, I'm not sure that I do.
>
> Q  Okay. Then the—what made you then write down that Mr. Wollaston would not have a permanent impairment from the stepping in the hole incident when you checked no?
>
> A  Yeah, I don't—when I saw him that day I didn't think—I couldn't imagine him having—I didn't anticipate. I think you have to go with the odds.
>
> Q  Okay.
>
> A  And (indiscernible) may be wrong too often, but I think. . . .
>
> Q  And then based on what you observed that day, he had a mild to moderate ankle sprain?
>
> A  I don't think I'd put him in the moderate category.
>
> Q  Just mild?
>
> A  Mild to modest. I don't think he had a moderate injury. I think I'd say be sure you get back in here or see—I think it was—commonly I make the call that whoever-if I think he needs a follow—up in 10 days for sure, I'll call one of the orthopedic offices (indiscernible) to see if they can't get him right away (indiscernible).
>
> . . . .
>
> Q  Okay. It says here that—off work for four to—eight—or eight to 14 days.
>
> A  It came to, I think, seven. Yeah. And definitely between eight and seven and 10 or. . . .
>
> Q  And it says on something work. I can't read your writing.
>
> A  Let me try. Let's see. I put down here, eight to 14 days for regular work, it's supposed to be.

> Q  Okay. Regular work.
>
> A  And modified work if available. And they didn't—I maybe wrote this down before I made the check there. May need seven to 10 days if modified work is not available.
>
> Q  To find out how he was doing from this ligamentous injury, would you have wanted to see him back?
>
> A  I think that speaks for itself. I was not much impressed with it, and he can—if he's bearing weight flat-footed, and is not uncomfortable in a week—seven to 10 days has no problems, I don't think it's worth 60 bucks for somebody's office call.
>
> Q  Okay. And if he is having problems?
>
> A  Then he should be rechecked, and this is why I said down here, recheck in seven—recheck PRN in seven to 10 days.
>
> Q  Okay.
>
> A  If recheck was needed in seven to 10 days. If he's still having symptoms. I certainly—and people in that setting I virtually always tell them I'm leaving the door open. If you're not doing as well as I think you're going to do, you come back in, or you'll be seen. I think unequivocally I tell patients that, that I don't necessarily think I need to see again, but that they're not cutting off their eligibility for the care for that injury.

3.  AS 23.30.120(a)(1) provides:

    (a) In a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in the absence of substantial evidence to the contrary, that

    (1) the claim comes within the provisions of this chapter[.]

4.  *See Tolbert v. Alascom*, 973 P.2d 603, 611 (Alaska 1999).

5.  805 P.2d 976, 977 (Alaska 1991) (footnote omitted).

6.  836 P.2d 941, 942 (Alaska 1992).

testify that in his opinion Wollaston's disability is probably not attributable in any substantial way to the work-related injury.[7]

7. The following are excerpts of Dr. Riederer's testimony which, according to the dissent, support the board's decision.

A [T]his usually screams at you in terms of a Achilles tendon injury, and I examined him carefully with that in mind, specifically with him either—you're stressing the Achilles tendon either by having him stand on the ball of his foot or having him lie and dorsiflex the foot so if that is not intact, or have him press the foot down against resistance. People that have a rupture that's complete or partial, can't do that well. I did not comment—or the notes that I made refer to—I put painful under the medial malleolus, which I probably should have said tender, but I certainly, by examining the ankle for stability, usually go around the ankle more, that is, around the medial portion here was where I specified it as tender, but you will go around certainly laterally. He certainly had no evidence of Achilles tendon injury, in my opinion, either by stressing the—the—this tendon the name of which I mentioned or by feeling any defects in the Achilles tendon that could be ruptured anywhere from the heel up six inches above the injury can occur.... I didn't—certainly was not an ecchymotic swollen joint.

....

Q So you didn't see—you didn't observe discoloration, an ecchymosis?

A I—I did not see that.... I don't tell people to bear weight the next day, and like I said, I think you can go back to work if you can bear weight flat-footed.

....

Q If the stepping in the hole incident had damaged the ankle sufficiently, would you have expected to see swelling and some discoloration by the time you saw him?

A That certainly is a common finding 72 hours out to find something of that nature.

....

A The history made me concerned about Achilles tendon. The exam did not.

....

A [B]ut after examining him, it was not a concern.

Q And you tested that and you didn't find any obvious problem with the Achilles tendon?

A That's correct....

....

A Correct. On the inside of his ankle.

....

A [W]here he was tender was medially....

....

Q It was a horrendous discoloration.

A [I]t certainly sounds horrendous any time you dislocate....

....

A I think he described the foot as being almost 90 degrees or something like that.

....

The presumption of compensability therefore has not been rebutted and thus the statutory presumption that Wollaston's claim

A Where the snap came from was troubling to me when he didn't have anything in his Achilles tendon....

....

A Inside of his ankle.

Q The inside of his ankle, not the outside? Okay. And he complained about the back of the ankle. That's where he said he told you he had felt this tear?

A Yeah, he said he felt the tear, but I wasn't impressed by any findings on the back of the ankle by going over it.

....

A Some swelling on the inside of the ankle.

....

A [B]ut he didn't have marked swelling or discoloration.

....

Q [T]he radiologist's note—they did note the swelling.

A On the inside.

Q [Y]ou put down ligamentous injury, right ankle.

....

Q What were you referring to? Which ligament, if any, were you referring to?

A The inside ligaments....

Q Could it have involved the ligament running in back of the ankle, in back of the heel?

A I had no reason to think that.... I'm certain that I felt that Achilles tendon carefully up and down, and ... where he was tender medially, I made no note of him being significantly tender posteriorly....

....

Q Okay. Would your examination fit within that?

A No, I had no reference to anything posterior.

....

A When I examined him, I found nothing objective there.

....

A And he wasn't particularly tender over his Achilles tendon at all when I stressed him.

....

A [L]ike I say commonly you see with an ankle sprain, blood from their heel to their toes at 72 hours or more.

Q Or more?

A Yeah.

....

A [B]ut you would have expected something by three days if he had significant injury. You can expect something in two hours if it's really a bad ankle sprain, someone playing ball. Or one hour.

....

A But three—three days, that seems like plenty time for discoloration to occur.

....

A His complaint was pain behind his heel. His tenderness was on here.

....

is covered controls. It follows that insofar as it terminated compensation as of July 7, 1996, the decision of the board must be reversed.[8]

REVERSED and REMANDED for remand to the board for further proceedings in accordance with this opinion.

EASTAUGH, Justice, with whom CARPENETI, Justice, joins, dissenting.

I respectfully dissent. In my opinion, the board did not err in relying on Dr. Riederer's testimony in concluding that the employer successfully rebutted the presumption of compensability under AS 23.30.120(a).[1]

1. **The court's dismissal of Dr. Riederer's testimony as "predictive" is both factually incorrect and doctrinally troublesome.**

Dr. Riederer testified that he did not observe the normal indicia of a serious ankle injury upon examining Wollaston seventy-two hours after the work-related accident. He repeatedly testified that Wollaston's ankle was weight-bearing, and not discolored or swollen. He further testified that while his physical examination revealed some tenderness on the inside of the ankle, it produced no objective indicia of the posterior ligament or tendon trauma that Wollaston claimed was the primary source of his permanent partial impairment. Based on these clinical observations, Dr. Riederer diagnosed Wollaston with a ligamentous injury on the inside of the ankle/foot structure—a mild to modest ankle sprain. There is nothing predictive or speculative about this diagnosis.

> A  He was on the inside of the ankle joint.
> . . . .
> A  If he could bear weight flat-footed without taking pain pills ... I don't tell people that who have a swollen foot, so he. . . .
> . . . .
> A  [I]f he's bearing weight flat-footed. . . .
> . . . .
> A  [T]he only place where he was tender on exam was on the inside of the ankle.

8. The award of attorney's fees must be vacated as it was dependent on the resolution reached by the board which this opinion reverses. The other claims of error presented by Wollaston are mooted by our decision.

1. *Tolbert v. Alascom, Inc.*, 973 P.2d 603, 611 (Alaska 1999) (employer must provide substantial evidence to rebut presumption of compensability); *Veco, Inc. v. Wolfer*, 693 P.2d 865, 869 (Alas-

Further, there is nothing inherently insufficient about Dr. Riederer's estimation of Wollaston's likely recovery time. Dr. Riederer thought Wollaston would fully recover within one to two weeks. This estimation was based on Dr. Riederer's sound medical examination in combination with years of experience dealing with many types of ankle injuries of different levels of severity. His opinion should not be dismissed simply because Wollaston did not return for a checkup.

The court, however, dismisses Dr. Riederer's prognosis as "predictive based on a fixed past perspective,"[2] because Dr. Riederer's contemporaneous recovery estimation and subsequent testimony were based upon a single examination performed before Wollaston had fully recovered from his injury. Many recovery prognoses made by original treating physicians would be subject to the same criticism.[3] I think it is undesirable to reject such evidence. Employees may not return for follow-up treatment or examination to the physicians who first treated them, or may still be in the early stages of recovery when they do so. But the original physician's observations, diagnoses, and prognoses are closest in time to the injury and least likely to be influenced by litigation strategy. By signaling that the board should disregard these physicians' analyses, the court unduly limits useful and relevant expert evidence of the employee's condition. This restriction may increase litigation costs by forcing par-

ka 1985) (same). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support [the board's] conclusion." *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978) (citations omitted).

Because the presumption shifts only the burden of production and not the burden of persuasion, we review any evidence tending to rebut the presumption in isolation, without reweighing the rebuttal evidence against the evidence tending to establish causation. *Wolfer*, 693 P.2d at 869.

2. Op. at 1066.

3. The court cannot intend to apply the "predictive" pejorative to *all* medical estimations of recovery periods. After all, permanent impairment determinations often involve a type of prediction—usually a prediction of the extent to which the patient will not fully recover.

ties to hire additional experts rather than rely on the opinions of the original treating physicians. And this limitation may disadvantage both employees and employers: an opinion favorable to the employee's claim would be entitled to little weight when the board determines whether the employee has proved his claim by a preponderance of the evidence.

### 2. Dr. Riederer's testimony is sufficient to rebut the presumption of compensability.

Dr. Riederer's testimony fits seamlessly with the surrounding evidence. Wollaston's non-work-related basketball injury—which occurred just seven months before his work-related injury—was tremendously destructive. The X-ray report of the basketball injury indicated "a complete dislocation at the ankle joint w[ith] the foot at right angles to the tibia."[4] The treating physician, Dr. Catalanello, characterized the basketball injury as being as serious an injury as one could sustain without tearing the ankle open. Dr. Riederer testified that the basketball injury was "horrendous." Dr. Catalanello's emergency room report notes that he "warned patient that there is no guarantee that he will not experience a permanent dysfunction secondary to this lesion." The owner of Schroeder Cutting and two of his employees testified that Wollaston had still not recovered from the basketball injury when he returned to work over two months later.

Further, Wollaston's behavior after his work-related accident tends to confirm Dr. Riederer's diagnosis of a mild sprain. Wolla-

ston did not seek further medical treatment until about a month after visiting Dr. Riederer. It is not surprising Wollaston did not return to Dr. Riederer because Wollaston had moved to Texas. But if his work-related injury had in fact been serious, one would expect him to have seen some physician for treatment sooner than he did.

Taking Dr. Riederer's testimony in combination with the evidence of Wollaston's devastating prior injury and his behavior following his work-related injury, the board could reasonably conclude that the employer had rebutted the presumption of compensability either by providing an alternative explanation for Wollaston's disability—i.e., the basketball injury—or by "directly eliminat[ing] any reasonable possibility" that Wollaston's work-related injury was a "substantial cause of his disability"[5] beyond July 7, 1996.[6]

The court, however, faults Dr. Riederer's testimony for failing to explicitly opine that the work injury was not a substantial cause of Wollaston's disability.[7] I think the board could permissibly disagree with the accuracy of this characterization of Dr. Riederer's testimony.[8] But in any event, there can be no serious doubt that Dr. Riederer believed Wollaston's work-related injury was probably not the cause of any impairment beyond the estimated one-to-two-week recovery period.[9] Requiring medical experts to mold their opinions to fit legal formulae is unlikely to improve the accuracy of their testimony.

Likewise, it is of little significance that Dr. Riederer did not stridently disagree with Dr. Whittemore's diagnosis of a posterior liga-

---

**4.** Dr. Catalanello attested that Wollaston's accident "flipped [his ankle] under completely 90 degrees."

**5.** *Grainger v. Alaska Workers' Comp. Bd.,* 805 P.2d 976, 977 (Alaska 1991).

**6.** The board found that the presumption of compensability had not been rebutted for the period prior to July 7, 1996.

**7.** Op. at 1067–1069.

**8.** Dr. Riederer testified that based upon his examination of Wollaston, he "did not anticipate any permanent residual" impairment. Although Dr. Riederer stated that his recovery prognoses were not always correct, this was nothing more

than a refreshingly candid admission of the uncertainty of medical practice. Dr. Riederer unequivocally stated that he would make the same diagnosis again if faced with a similar injury.

**9.** Dr. Riederer did testify that he thought the work injury may have aggravated the previous injury. We have held that "[i]n the case of a preexisting condition associated with a disability, a claim is compensable upon a showing that employment (1) aggravated, accelerated, or combined with a preexisting condition so as to be (2) a substantial factor in bringing about the disability." *Estate of Ensley v. Anglo Alaska Constr.,* 773 P.2d 955, 958 (Alaska 1989) (citations omitted). But this theoretical avenue of recovery is not before us, because Wollaston claims he had completely recovered from his basketball injury before his work injury occurred.

ment injury or Dr. Whittemore's assessment of permanent impairment when given the opportunity to do so by Schroeder's attorney. If anything, it may have bolstered his credibility before the board.

Because the court holds that Dr. Riederer's testimony was insufficient to rebut the presumption of compensability, it does not address whether substantial evidence supported the board's conclusion that Wollaston failed to prove his claim by a preponderance of the evidence.[10] I would hold that the evidence discussed above is sufficient to support the board's ultimate decision as well as its decision that the presumption was rebutted. I would therefore affirm the superior court's affirmance of the board's decision.

---

10. When we review the board's decision that the employee did or did not prove her claim, we apply the substantial evidence test. *Wolfer,* 693 P.2d at 870. As with our review of whether the evidence is sufficient to rebut the presumption of compensability, we do not reweigh the evidence or choose between competing inferences. *Beauchamp v. Employers Liab. Assurance Corp.,* 477 P.2d 993, 997 (Alaska 1970).