Evelyn Q. RIVERA, Appellant,

v.

WAL–MART STORES, INC., Employer,
and American Home Assurance
Co., Insurer, Appellees.

No. S–13747.

Supreme Court of Alaska.

Feb. 11, 2011.

Phillip J. Eide, Eide, Gingras & Pate, P.C., Anchorage, for Appellant.

Michelle M. Meshke, Russell, Wagg, Gabbert & Budzinski, Anchorage, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Evelyn Rivera twice injured her back while working at Wal–Mart. After initially paying workers' compensation benefits to her, Wal–Mart filed a controversion because its physician thought that she had suffered only a temporary aggravation of a preexisting low back condition that should have healed by the date of controversion. After a hearing, the Alaska Workers' Compensation Board denied Rivera's claim. She appealed to the Alaska Workers' Compensation Appeals Commission, arguing that the Board failed to make findings on material issues and did not evaluate the lay testimony she presented. The Commission affirmed the Board's decision. Because we find no error in the Commission's decision, we affirm.

## II. FACTS AND PROCEEDINGS

Evelyn Rivera worked at Wal–Mart in Anchorage beginning in 2002. She had at least one episode of back pain that prompted her to seek medical attention before she began working at Wal–Mart, but she worked there without significant back pain for about three years. Rivera's first position at Wal–Mart was a stocker on night shift. She later transferred to a day-time position in the baby department, where she broke down pallets of merchandise, including cribs and baby furniture. She again changed duties in late 2005, moving to a processing position, which entailed breaking down pallets of merchandise, checking prices, hanging clothes, and moving racks of clothing onto the floor. She worked other positions, such as cashier, on an as-needed basis.

On September 3, 2005, Rivera was assigned to work at a store baby shower promotional event. She moved tables and chairs to set up for the event and also retrieved a crib. She experienced some pain while setting up. She had more pain as she bent over to cut a cake and asked a coworker to finish cutting the cake. When she later bent over to serve a soda to a child, she felt pain in her back and right leg all the way down to her ankle; for a short period of time she was unable to stand up. She took over-the-counter pain medication that night for the injury, but it did not relieve her pain. She went to the Elmendorf emergency room on September 6. The doctor there gave her prescription pain medication and told her to see her family physician. Rivera saw Dr. Carol Grobner later that month; Dr. Grobner referred her to physical therapy and prescribed anti-inflammatory medications. Rivera was

initially restricted to light-duty work, but she asked to go back to regular-duty work in October 2005. On October 30, 2005, a physician's assistant released her to work without limitations.

Rivera had an episode of back pain in January 2006 that prompted her to go to the emergency room again; according to the medical record from her visit, she was "unsure" of what occurred to cause the pain. In May 2006 Rivera reported a second work-related injury. She was working in the garden department and performed a series of tasks that injured her back. First, she and another employee moved racks of plants to the floor. She then assisted a customer by getting a pet carrier from an overhead shelf. Finally, she was cashiering and had to scan a bag of rocks. She felt extreme pain in her back and sought medical care for it.

Rivera was treated with a combination of medication and physical therapy. Imaging studies showed disc dessication; some annular tears; and facet hypertrophy, an arthritis-type condition, at many levels in her lower back. In October 2006 Rivera's treating doctors referred her to a pain clinic, where she saw Susan Klimow, M.D. Dr. Klimow tried treating her with facet blocks to relieve her pain, but Rivera did not respond to the injections. Dr. Klimow restricted Rivera's work activities to the sedentary level because of Rivera's symptoms and prescribed aquatic physical therapy because Rivera had not shown improvement with regular physical therapy. Dr. Klimow also performed an electrodiagnostic study of Rivera's right lumbosacral paraspinal muscles; the study results were normal. Dr. Klimow referred Rivera to a neurosurgeon to see if Rivera might benefit from surgery because her pain was not responding to the different treatments Dr. Klimow had tried. The neurosurgeon concluded that Rivera's back pain "seem[ed] most consistent with muscle strain." He did not recommend surgery but thought she should continue with conservative treatment.

Rivera was fired from her job at Wal–Mart in January 2007 for taking too long on her breaks. Rivera said that she took longer breaks than permitted because of her back pain, but her account was disputed at the workers' compensation hearing. Wal–Mart continued to pay for medical care related to Rivera's back after she was fired, but it did not pay any type of disability benefits to her at that time.

Wal–Mart arranged an employer's independent medical evaluation (EIME) with Marilyn Yodlowski, M.D., an orthopedic surgeon, on April 18, 2007. Dr. Yodlowski's report concluded that Rivera had "[d]egenerative disease of the lumbosacral spine including degenerative disc disease and facet arthropathy."[1] Dr. Yodlowski agreed that Rivera had suffered a work-related injury but thought that the injury was a strain or sprain that had resolved no later than three months from the date of the last injury. Dr. Yodlowski stated that the earlier injury was not a substantial factor in Rivera's ongoing pain complaints and that the later injury was not the substantial cause of her disability.[2] Dr. Yodlowski also thought that both injuries had resolved by the time of the examination, that Rivera was medically stable for the conditions related to the work injuries, and that she needed no further medical treatment for the work-related injuries. Dr. Klimow reviewed Dr. Yodlowski's report in February 2008 and agreed with its conclusions.

Based on Dr. Yodlowski's report, Wal–Mart filed a notice of controversion. In response, Rivera filed a workers' compensation claim for temporary total disability (TTD) benefits from the date of her second injury and for medical costs. Wal–Mart admitted short periods of TTD and some medical costs but denied the claims for other periods of TTD and for medical benefits after April 18, 2007.

1. According to Dr. Klimow, facet arthropathy and facet hypertrophy are the same condition.

2. One of Rivera's injuries happened before November 7, 2005, the effective date of the amendments to the workers' compensation act that changed the causation standard from "a substantial factor" to "the substantial cause." *See Pietro v. UNOCAL Corp.*, 233 P.3d 604, 616 n. 31 (Alaska 2010) (citing ch. 10, § 9, FSSLA 2005 and describing change in legal standard of causation). The second injury happened after November 7, 2005.

After the controversion, Rivera resumed treatment at the Elmendorf clinic. She reported continuing back pain, and in May 2008 she was again placed in physical therapy. Elmendorf medical providers prescribed a TENS unit for her,[3] and one physician predicted that Rivera would not have the permanent physical capacities to perform her previous work. But that physician did not think that Rivera would have a permanent impairment from the work-related injury.

The Board held a hearing on Rivera's claim on June 25, 2008. Rivera testified on her own behalf and also presented medical testimony from Dr. Grobner and lay testimony from her husband, Roy Johnson, as well as her former coworker, Brigitta Castillo. Wal–Mart presented testimony from Tracy Wagoner, a personnel manager at Wal–Mart. Deposition testimony of Dr. Klimow and Dr. Yodlowski was also presented.

Rivera described the work activities that caused her back pain and gave her version of the events that led to her being fired. She reported that she had been compliant with the treatments doctors prescribed but continued to have pain, although there had been a slight improvement in her condition. Her husband's testimony supported her own. He described in greater detail some of the restrictions the back pain caused in her daily activities. Castillo testified that she sometimes had to help Rivera get up after sitting during breaks at Wal–Mart because of Rivera's back pain; she also testified that she had observed Rivera in pain at work. Castillo indicated that she also had been fired from Wal–Mart for taking too long on her breaks.

Dr. Grobner testified that she was a family practice physician and was not certified in either orthopedics or rehabilitative medicine. She testified about Rivera's medical treatment at Elmendorf. She acknowledged that she personally had seen Rivera only a few times and that Rivera had also been treated by a physician's assistant and a physical therapist. Dr. Grobner stated that she had gone into private practice in May 2007 and had seen Rivera only once, the day before the hearing, since May 2007. The day before

the hearing, Dr. Grobner diagnosed Rivera with somatic dysfunction, meaning that her spine was not aligned properly. Dr. Grobner proposed treating it with osteopathic manipulation. Dr. Grobner also summarized the MRI findings and noted that any of the conditions shown on the MRI could cause lower back pain. Dr. Grobner described the restrictions medical providers had placed on Rivera's activities and indicated that those restrictions continued. She thought Rivera's back problems could take about two years to resolve. Dr. Grobner agreed that Rivera's injuries were likely not the cause of the multi-level annular tears shown on the MRI and that her work-related injuries could be considered "strains."

Tracy Wagoner, a personnel manager at Wal–Mart, testified about Rivera's work history and the circumstances that led to her firing. Wagoner testified that Rivera initially worked full time at Wal–Mart but asked to work only part time in 2003. Wagoner said that Rivera was fired for taking too long on breaks; she denied that Rivera was fired for reasons related to her injuries. Wagoner indicated that Rivera had been temporarily assigned to such jobs as "greeter" in order to accommodate her injury-related restrictions. According to Wagoner, Wal–Mart only gave Rivera duties that complied with Rivera's medical restrictions. Rivera's final job at Wal–Mart was a fitting room attendant.

Dr. Yodlowski testified consistently with her report. She agreed that Rivera was in pain but thought that Rivera's reactions during the physical exam she performed were not consistent with objective medical evidence. Specifically, Dr. Yodlowski noted that Rivera "reported sensation in a non-nerve root pattern" and had a pattern of weakness that did not correspond to a nerve root injury. Dr. Yodlowski testified that the annular tears on Rivera's MRI were related to degenerative changes rather than trauma. According to Dr. Yodlowski, Rivera's work-related injuries "would have caused a transient temporary strain [or] sprain but not the underlying pathological conditions." Dr. Yodlowski thought that Rivera could do the

---

**3.** TENS stands for transcutaneous electrical nerve stimulation. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1668 (28th ed.1994). A TENS unit is a treatment for pain.

work described in the job descriptions provided by Wal–Mart. She indicated that Rivera did not have "lifting restrictions due to her work-related injury" although she might "have a limited tolerance" for lifting because of the degenerative changes in her back. Dr. Yodlowski also testified that Rivera "has every reason to have back pain in terms of the degenerative findings, and it's the kind of back pain that could potentially wax and wane" but that Rivera's "subjective responses regarding her numbness, her [diffuse] motor weakness, are not explained by any medical pathology or medical reason." Dr. Yodlowski indicated that people with degenerative back changes can develop "the onset of symptoms with or without trauma" and that "it's just a matter of time when their symptoms come on." Dr. Yodlowski testified that she had no reason to doubt Rivera's account of the onset of her back pain.

In her deposition, Dr. Klimow reaffirmed her agreement with Dr. Yodlowski's report and her opinion that Rivera was medically stable. Dr. Klimow testified that Rivera had disc desiccation from L3 to S1 and had facet hypertrophy at several levels as well. Dr. Klimow stated that she did not "relate desiccation of disc material or facet hypertrophy to one specific activity or even recurring activity"; instead, she considered them to be "routine degenerative changes." According to Dr. Klimow, the degenerative changes in Rivera's spine were "common findings" that did not produce pain in all people, but she also "had no reason to dispute that [Rivera] had lower back pain." She observed that "[f]acet syndrome [could] lead to radiating discomfort into the legs" and that disc protrusions as well as muscle strain could contribute to lower back pain. Dr. Klimow said that annular tears usually caused "localized discomfort to the lower back" rather than radiating pain. Her initial impression was that Rivera's pain was related to her facet hypertrophy, but Rivera got no relief from treatment for this condition. Dr. Klimow testified that she limited Rivera's activities to sedentary based on her symptoms and that she had not, during the course of her treat-

ment of Rivera, changed that restriction. Dr. Klimow stated that she planned to move Rivera to light duty at about the time her treatment of Rivera ended.

In December 2008 the Board denied Rivera's workers' compensation claim, finding that she had not proven by a preponderance of the evidence that she suffered more than temporary aggravations of her back condition in 2005 and 2006. After summarizing the testimony, the Board applied its three-step analysis.[4] It did not use a different legal standard to evaluate the second injury, even though it acknowledged that the workers' compensation statute had changed between the two injuries. It determined that Rivera had attached the presumption of compensability through Dr. Grobner's testimony. It then decided that Wal–Mart had rebutted the presumption through the testimony of Dr. Klimow and Dr. Yodlowski. Finally, it weighed the evidence, giving the most weight to Dr. Klimow's opinion that Rivera's "pre-existing degenerative disc disease [was] the true underlying cause of [Rivera's] current need for treatment." It gave less weight to Dr. Grobner's opinion, which it characterized as "inconclusive, and based on 'possibilities' that [Rivera's] low back condition [was] related to her work strains." It concluded that Rivera "suffered temporary aggravations of a long pre-existing condition in 2005 and 2006" and "any aggravation to her low back ... condition would have resolved shortly after each minor strain [or] sprain."

Rivera appealed to the Alaska Workers' Compensation Appeals Commission, arguing that the Board failed to make adequate findings about the lay testimony, failed to give "adequate weight" to Dr. Grobner's testimony, and ignored contradictions in Dr. Klimow's and Dr. Yodlowski's testimony.

The Commission affirmed the Board's decision. The Commission decided that the Board did not need to make findings about the lay testimony because the testimony was not material to Rivera's case. It also concluded that the Board did not improperly

**4.** *See Smith v. Univ. of Alaska, Fairbanks,* 172 P.3d 782, 788 (Alaska 2007) (summarizing the three-step analysis).

weigh Dr. Grobner's testimony and distinguished Rivera's case from *Smith v. University of Alaska, Fairbanks*[5] on the basis that "the board did not require Rivera to produce an opinion in a particular probability formula to have sufficient evidence to support an award." The Commission found no material contradictions in the opinion of Dr. Yodlowski or Dr. Klimow and wrote that "[t]he board's decision to give greater weight to some medical evidence over competing evidence is conclusive." Rivera appeals.

## III. STANDARD OF REVIEW

■ In an appeal from the Alaska Workers' Compensation Appeals Commission, we review the Commission's decision.[6] We independently review the Commission's legal conclusions about whether substantial evidence supports the Board's factual findings, which requires us to independently review the record and the Board's factual findings.[7] "Substantial evidence to support factual findings is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[8] Whether the Board made adequate findings is a question of law that we review de novo.[9] The Board is required to make findings only about questions that are both contested and material.[10]

## IV. DISCUSSION

### A. The Commission Correctly Determined That The Board Did Not Improperly Evaluate The Medical Testimony.

Rivera raises two issues about the Board's treatment of the medical evidence. She con-

tends that the Board applied an incorrect legal standard to Dr. Grobner's testimony because it said that the testimony was based on "possibilities." She also argues that the Board improperly relied on Dr. Yodlowski's opinion, which she characterizes as legally irrelevant or immaterial evidence.

■ Rivera asks us to find that she is eligible for temporary total disability and medical benefits, asserting that the Board improperly relied on Dr. Yodlowski's testimony in rejecting her claim. Rivera focuses on Dr. Yodlowski's opinion that her work injury would not have worsened Rivera's underlying degenerative condition even though the injury "may have resulted in a temporary exacerbation of symptoms." According to Rivera, the Board's acceptance of Dr. Yodlowski's opinion ran afoul of our opinion in *DeYonge v. NANA/Marriott*, where we held that a work-related aggravation of symptoms can be compensable even when there has been no permanent change in an employee's underlying condition.[11] Wal–Mart maintains that the Board properly applied the rule in *DeYonge* and merely weighed the evidence, as it was required to do. The Board acknowledged our holding in *DeYonge*, but found that "any aggravation of the employee's symptoms was temporary and transient" because Rivera "missed little time from work associated with her injuries."[12]

The Board properly applied *DeYonge* to Rivera's case. In *DeYonge*, a worker was unable to continue performing her job duties because of ongoing arthritis pain.[13] All of the doctors who examined the worker, in-

5. *Id.*

6. *Kelly v. State, Dep't of Corrections*, 218 P.3d 291, 297 (Alaska 2009) (citing *Barrington v. Alaska Commc'ns Sys. Grp., Inc.*, 198 P.3d 1122, 1125 (Alaska 2008)).

7. *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

8. *Id.* (quoting *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000)).

9. *Leigh v. Seekins Ford*, 136 P.3d 214, 216 (Alaska 2006) (citing *Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1276 (Alaska 1999)).

10. *Bolieu*, 983 P.2d at 1275 (citing *Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 627 (Alaska 1996)).

11. 1 P.3d at 96.

12. The Commission did not discuss *DeYonge* in its decision. Rivera mentioned *DeYonge* in her arguments before the Commission, but she did not rely on *DeYonge* in her points on appeal to the Commission or in her opening brief.

13. 1 P.3d at 92.

cluding an orthopedic specialist the worker saw at her employer's request, agreed that her job duties would cause an increase in arthritic symptoms, even if those duties did not worsen her underlying condition.[14] Because the worker sought temporary total disability payments, we held that the Board impermissibly relied on opinions that the worker's duties did not permanently worsen her arthritic condition to rebut the presumption of compensability.[15]

Unlike the employee in *DeYonge*, Rivera was able to return to work shortly after sustaining her injuries. Substantial evidence in the record supports the Board's finding that she "missed little time from work associated with her injuries." No one contested that Rivera worked part-time prior to the 2005 injury, that she missed at most two days of work after this injury, or that she was released to work without limitations by November 1, 2005. At the Board hearing, Rivera agreed that by the end of October 2005, she was "feeling fine" and "having no problems."

■ After the May 2006 injury, Rivera initially missed less than one week of work and returned to lighter duty work.[16] Rivera continued to work at Wal–Mart until she was fired in January 2007. Her doctors never stated that she was totally disabled from work; they released her to work with restrictions and said only that she was "partially disabled to work." Rivera testified that dur-

ing December 2006 and January 2007, she did not tell her doctors that she was unable to work and did not ask them to release her from work. Because disability compensation is based on loss of earning capacity due to medical impairment and not on impairment alone,[17] Rivera's continued ability to work at Wal–Mart after sustaining her injuries showed that she was not totally disabled from work.[18]

■ There was also conflicting testimony about Rivera's ability to perform her regular work at Wal–Mart. Dr. Yodlowski said that Rivera might have lifting restrictions of no more than 35 pounds because of her degenerative conditions and could otherwise perform her previous work at Wal–Mart.[19] Dr. Klimow testified that she had restricted Rivera to sedentary work because of her symptoms but also indicated that she would have recommended that Rivera move to light duty after completion of a two-week aquatic physical therapy program.[20] Dr. Grobner testified that if Rivera "were to repeatedly lift over 15 pounds, ... she would be at risk for aggravating her back." The Board gave more weight to Dr. Klimow's and Dr. Yodlowski's opinions than to Dr. Grobner's. The Board has the authority to weigh the medical evidence, and it chose to give the most weight to Dr. Klimow's opinion.[21]

The fact that Rivera could and did work at Wal–Mart following her injuries distinguishes her case from *Leigh v. Seekins*

---

14. *Id.* at 92–93.

15. *Id.* at 97.

16. Wal–Mart paid Rivera TTD for approximately two weeks in October 2006 because of her medical treatment.

17. *Vetter v. Alaska Workmen's Comp. Bd.*, 524 P.2d 264, 266 (Alaska 1974).

18. At oral argument before us, Wal–Mart contended that *DeYonge* only permitted attaching the presumption of compensability because of increased symptoms and that any analysis based on *DeYonge* would be different because of the 2005 workers' compensation amendments. In *DeYonge*, we held that an increase in symptoms could be the basis of an award of disability benefits, not just a means to attach the presumption of compensability. 1 P.3d at 98. Wal–Mart did not ask either the Commission or this court

to consider whether Rivera's second injury should be analyzed differently from her first injury, so we accept the Board's use of its three-step analysis in this case. We observe nonetheless that the 2005 amendments did not prohibit an award of benefits based on increased symptoms. *See* ch. 10, § 9, FSSLA 2005.

19. Rivera's job as a stocker required lifting greater than 50 pounds.

20. Rivera's processing position was light-duty work.

21. AS 23.30.122 ("A finding by the board concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive...."). *See also Bouse v. Fireman's Fund Ins. Co.*, 932 P.2d 222, 240 (Alaska 1997) (noting that the Board could choose the views of some doctors over others).

Ford,[22] which she cites to support her argument. In *Leigh*, we vacated a Board decision denying disability benefits when the Board failed to make findings about whether the claimant was unable to work because of chronic pain and the medication used to control it.[23] We noted in *Leigh* that the Board should make findings that address whether pain makes a claimant disabled when "the claimant introduces evidence that chronic pain prevents him or her from working."[24] In Rivera's case, everyone agreed that she experienced pain and that it restricted her work activities. But the evidence showed that she worked her regular hours at Wal–Mart, in positions with lighter duties accommodating her injuries, after her on-the-job injuries. Rivera also testified that she did not tell her doctors that she was unable to perform the lighter duty work and did not ask them to release her from work.

■ The disputed medical question was the cause of Rivera's chronic pain, not its duration. Dr. Klimow and Dr. Yodlowski identified her degenerative conditions as the cause of her chronic pain, and the Board explicitly stated that it gave the most weight to Dr. Klimow's opinion, which was "joined" by Dr. Yodlowski's. The Board's findings about the weight given to medical testimony are conclusive.[25] We find no error in the Board's reliance on Dr. Klimow's and Dr. Yodlowski's opinions.

■ Rivera also contends that the Board applied an incorrect legal standard to Dr. Grobner's testimony. Wal–Mart responds that the Board properly weighed the medical evidence. The Board gave less weight to Dr. Grobner's testimony, finding her opinions "inconclusive" and "based on 'possibilities' that [Rivera's] low back condition [was] related to her work strains." The Commission

concluded that the Board had not required Rivera to "produce an opinion in a particular probability formula" and permissibly gave less weight to Dr. Grobner's testimony.

Rivera relies on our opinion in *Smith v. University of Alaska, Fairbanks*[26] to argue that the Board improperly "diminish[ed] the importance of [Dr. Grobner's] testimony because she expressed her opinion in terms of possibilities rather than probabilities." But in *Smith* the Board made no explicit findings about the weight it gave to the medical testimony.[27] We said that a probability formulation was not necessary to prove a claim but noted that "[t]he absence of a definitive statement from a physician that the industrial accident caused Smith's need for surgery, on a more-probable-than-not basis, may be an important factor for the board in making its ultimate decision."[28] We remanded the case to the Board for further findings so that it could "clarify the weight it accorded the lack of a definitive statement."[29] Here, the Board explicitly weighed the medical testimony and gave less weight to Dr. Grobner's opinions.

We agree with the Commission that the Board was permitted to treat Dr. Grobner's opinion as it did. Dr. Grobner did not testify that Rivera's on-the-job injuries caused her chronic pain. She stated: "In [Rivera's] case, again, it is very difficult to determine specifically because most low back pain is multi-factorial, meaning there's more than one cause and usually it's a combination of causes that can cause this." Although Dr. Grobner diagnosed Rivera with somatic dysfunction, she did not say that the work-related injuries caused or aggravated this condition. Because the Board is authorized to weigh the medical evidence,[30] it could give less weight to Dr. Grobner's testimony.

22. 136 P.3d 214 (Alaska 2006).

23. *Id.* at 218–19, 222.

24. *Id.* at 218.

25. AS 23.30.122.

26. 172 P.3d 782 (Alaska 2007).

27. *Id.* at 787.

28. *Id.* at 791–92.

29. *Id.* at 792.

30. AS 23.30.122.

## B. The Commission Correctly Concluded That The Board Did Not Need To Make Findings About The Lay Testimony.

■ Rivera argues that the Board was required to evaluate and make findings about the lay testimony she presented. She asserts that the lay testimony undermined the opinions of Dr. Klimow and Dr. Yodlowski because the doctors both testified that her work-related injuries only caused temporary aggravations of her preexisting back condition while the lay witnesses testified that she had continuous pain after her two job-related injuries, especially the May 2006 injury. Wal–Mart responds that the Commission correctly decided that the lay testimony was not material to any contested issue at the hearing. Wal–Mart maintains that the doctors did not question that Rivera continued to have pain but that they provided a different explanation for Rivera's ongoing pain complaints, namely her degenerative back condition.

The Commission decided that because Rivera did not produce evidence that her injuries prevented her from working at her last position at Wal–Mart, the lay testimony concerning her physical limitations was not material to her case. Rivera asserts that a remand to the Board is still necessary so that the Board "can consider the effects of the lay testimony [insofar] as it supports or detracts from the doctor's conclusions and make an appropriate finding." She contends that the Commission should not make a determination

about the materiality of the evidence when the Board has not explicitly done so.

■ Because the materiality of an issue is determined in relation to substantive law,[31] and because the Commission reviews questions of law using its independent judgment,[32] the Commission could properly decide whether an issue was material even though the Board did not make an explicit finding regarding its materiality. We agree with the Commission that the lay testimony was not material to a contested issue in this case.

The contested issue here was not whether Rivera had continuing back pain; the contested issue was the *cause* of the pain. All of the physicians agreed that (1) Rivera experienced continuing back pain; (2) her degenerative conditions could cause back pain; and (3) her work-related injuries were sprain or strain injuries. Dr. Klimow and Dr. Yodlowski agreed that Rivera was medically stable with respect to her work injuries.[33] The lay testimony described her pain and the limits on her activities. But these issues were largely uncontested, and Rivera does not explain how the lay testimony was relevant to the issue of causation.[34]

Dr. Yodlowski, whose opinion the Board accepted, testified that Rivera's degenerative conditions could cause back pain that waxed and waned. She also said that Rivera's degenerative conditions could become symptomatic with or without trauma. The physical therapy chart notes recorded that Rivera

**31.** *See* 1 Kenneth S. Broun et al, McCormick on Evidence § 185 (6th ed.2006).

**32.** AS 23.30.128(b).

**33.** Rivera's case differs from *Wollaston v. Schroeder Cutting, Inc.*, where we held that the employer had not rebutted the presumption of compensability through a medical opinion, given shortly after the injury happened, that predicted recovery from the injury in about ten days. 42 P.3d 1065, 1066, 1068 (Alaska 2002). The prediction proved to be incorrect, and we described the doctor's opinion as "predictive based on a fixed past perspective," noting that the doctor's "testimony never progressed ... to a current expression of opinion as to Wollaston's actual condition or its causes." *Id.* The same cannot be said of Dr. Yodlowski's or Dr. Klimow's opinion. Dr. Klimow saw Rivera a number of times after the second work-related injury, and Dr. Yodlowski

examined Rivera almost a year after the second injury occurred. They expressed opinions as to the causes of Rivera's pain complaints. Both doctors acknowledged that Rivera had pain but attributed her chronic pain to her degenerative conditions rather than her work-related injuries.

**34.** Rivera's argument about causation—that her work injuries were the cause of her pain because she had continuing pain after the injuries—resembles the *post hoc ergo propter hoc* logical fallacy that we have rejected in other workers' compensation cases. *See Lindhag v. State, Dep't of Natural Res.*, 123 P.3d 948, 954 (Alaska 2005) (rejecting the argument that a worker's asthma was caused by workplace exposure to chemicals when the worker was diagnosed with asthma after the exposure).

experienced increased back pain from cooking and picking up after her children.

Although Rivera contends that her case is similar to *Smith v. University of Alaska, Fairbanks*,[35] it differs from that case in significant ways. *Smith* involved disputed issues of causation related to the need for back surgery.[36] There, a worker injured his back at work in early July but did not see a doctor until almost four weeks later, after he experienced a sharp increase in pain when he got into his truck.[37] The worker's treating physician and the employer's physician disagreed sharply about the cause of the back pain: The employer's doctor thought that scar tissue from earlier surgeries was the cause of the pain, while the treating physician gave the opinion that the worker had a herniated disc.[38] The Board did not specify which doctor it relied on in making its decision, using testimony from both doctors to support its findings.[39] Because the doctors testified about specific symptoms related to their diagnoses, and because lay witnesses could testify about whether they observed these symptoms in the weeks after the work-related injury, the lay testimony there was material to the doctors' opinions about causation.[40] We noted in *Smith* that the lay testimony might "have more probative value than in other cases with uncertain medical causation" because no doctor examined the worker in the weeks between the work-related injury and the back surgery.[41]

Here, in contrast, Rivera consulted with medical providers shortly after both work-related injuries and saw Dr. Klimow approximately once a month between October 2006 and May 2007. In addition, Rivera attended physical therapy sessions during much of the time she consulted with Dr. Klimow. Dr. Klimow's records indicated that she and Rivera discussed Rivera's work duties and the

restrictions on her activities. In Rivera's case, the lay testimony corroborated facts that the doctors accepted—that Rivera suffered back pain that limited her activities. The lay testimony was not material to contested issues here, so the Board was not required to make findings about it.[42]

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the Commission's decision.

CHRISTEN, Justice, not participating.

---

35. 172 P.3d 782 (Alaska 2007).

36. *Id.* at 785.

37. *Id.* at 784–85.

38. *Id.* at 785–86.

39. *Id.* at 787, 791.

40. *Id.* at 790–91.

41. *Id.* at 790.

42. *See Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1275 (Alaska 1999) (citing *Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 627 (Alaska 1996)) (holding that "[t]he Board need only make findings with respect to issues that are both material and contested").